DAVID N. SMITH AND JUDITH A. SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT RONALD E. SCHLEPPY AND LEONETTE R. SCHLEPPY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1959-74, 4109-74.    Filed June 29, 1976.

*Richard G. Holloway* and *William E. Duncan, Jr.,* for the petitioners.

*Albert L. Sandlin, Jr.,* and *Howard J. Kalson,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in Federal income tax of petitioners David N. Smith and Judith A. Smith for the calendar years 1968 and 1969 in the amounts of $7,333 and $4,916, respectively, and additions to tax under section 6653(a), I.R.C. 1954,[1] in the amounts of $367 and $246, respectively. Respondent determined deficiencies in Federal income tax of petitioners Ronald E. Schleppy and Leonette R. Schleppy for the calendar years 1969 and 1970 in the amounts of $45,888 and $4,518, respectively, and an addition to tax under section 6651(a)(1) for the calendar year 1970 in the amount of $385. David N. and Judith A. Smith filed an amendment to petition claiming an overpayment in tax for 1969 with a net operating loss for that year which they contend results in a net operating loss carryback to 1968 and an overpayment for that year.

Some of the issues have been disposed of by agreement of the parties, leaving for our decision the following:

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

(1) Whether either David N. Smith or Ronald E. Schleppy or both suffered any loss or realized any gain during the calendar year 1969 from surrender by each of them to a corporation of which they were principal officers and controlling stockholders of a portion of the shares of stock each held in the corporation;

(2) Whether either David N. Smith or Ronald E. Schleppy or both are entitled to an ordinary and necessary business expense deduction for the calendar year 1969 of the value of the shares of stock surrendered by them to the corporation and, if so, the amount of the deduction;

(3) Whether David N. Smith and Judith A. Smith are entitled to a net operating loss deduction for the calendar year 1968 as a result of a carryback of a net operating loss sustained in 1969 by virtue of a deduction arising from the surrender of Mr. Smith's stock to the corporation; and

(4) Whether David N. Smith and Judith A. Smith are liable for an addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a) for the calendar years 1968 and 1969.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time of the filing of their petition in this case, David N. Smith (Mr. Smith) and Judith A. Smith, husband and wife, resided in Atlanta, Ga. They filed joint Federal income tax returns for the calendar years 1968 and 1969 with the Director of the Internal Revenue Service Center, Chamblee, Ga.

At the time of the filing of their petition in this case, Ronald E. Schleppy (Mr. Schleppy) and Leonette R. Schleppy, husband and wife, resided in Stanford, Conn. They filed joint Federal income tax returns for the calendar years 1969 and 1970 with the Director of the Internal Revenue Service Center, Chamblee, Ga., and the Director of the Internal Revenue Service Center, Andover, Mass., respectively.

On January 2, 1968, Communication & Studies, Inc. (C. & S. or the corporation), was incorporated under the laws of the State of Georgia with its principal business office in Atlanta, Ga. C. & S. was engaged in the business of directly selling home reference works, which generally included one or more sets of encyclopedias, dictionaries, children's books, and classics, to

consumers on an installment sale basis. The corporation established branch offices throughout the continental United States.

The corporation's authorized capital structure was 2 million shares of one class of common stock. The shareholders were entitled to one vote on a noncumulative basis for each share held, to receive any declared dividends, and to acquire the net assets of the corporation upon its liquidation.

The corporation's initial capitalization was $200,000 of which Mr. Schleppy and Mr. Smith contributed $120,000 and $80,000, respectively, and for which they received 510,000 and 340,000 shares of the corporation's common stock, respectively. The cost basis of each share of stock held by Mr. Schleppy and Mr. Smith from their initial acquisition was $0.235. At its inception C. & S. had a commitment of a line of credit of $1 million with an Atlanta bank that could be extended to as much as $4 million. The corporation's loan agreement with the local bank permitted C. & S. to borrow an amount equal to 65 percent of its current accounts receivable which were pledged along with substantially all of its other assets to the bank to secure the loan. The loan agreement prohibited the corporation from declaring any dividends without the bank's approval. Mr. Schleppy and Mr. Smith personally guaranteed the payment of the bank's loan to C. & S.

During the existence of the corporation, Mr. Schleppy was the chairman of its board of directors and its president. He was responsible for the overall management of the corporation. Mr. Smith was a director and executive vice president of C. & S. and was primarily responsible for sales. Herbert S. Perman (Mr. Perman) was initially a vice president for finance, treasurer, assistant secretary, and director of the corporation. Mr. Schleppy, Mr. Smith, and Mr. Perman were members of the executive committee. Dominick Langello (Mr. Langello) was a vice president for branch administration and a director of the corporation. Mr. Perman and Mr. Langello were each issued 10,000 shares of stock by the corporation upon its formation.

Officials of the bank advised the officers of C. & S. that the corporation should increase its equity. On January 6, 1969, Mr. Schleppy on behalf of C. & S. and Roger D. Bensen (Mr. Bensen) on behalf of Shareholders Associates, Inc. (Associates), a regulated investment company located in New York, N.Y., which

was a subsidiary of Shareholders Capital Corp., entered into an agreement (the agreement) for the sale and purchase of C. & S.'s convertible notes (notes) and shares of its common stock in a private sale exempt from the requirements of the Federal Securities and Exchange Act of 1933. The agreement generally provided that C. & S. would authorize the issuance of $1 million principal amount of its 7-percent convertible subordinated notes due January 1, 1974, and an aggregate of 83,333 shares of its common stock at par and would sell to Associates such notes for $1 million and such shares for $500,000. It further provided that the notes were generally subordinated to the corporation's long-term indebtedness, except for funds borrowed under the loan agreement with the local bank, and long-term rental obligations created or incurred prior to the maturity of the notes and otherwise permitted under the agreement. The holders of any of the outstanding notes which C. & S. sold to Associates had the right to convert all or any portion in units of $100 of the principal amount of such notes into common stock of C. & S. at a price of $7 per share.[2] At a conversion price of $7 per share, the holders of the notes had the right to obtain 142,858 shares upon the conversion of all the notes. The conversion price and number of shares issuable on conversion were to be adjusted to prevent any dilution of the rights of the holders of the notes. Additionally, the corporation was required to reserve a sufficient number of shares of its authorized common stock for issuance in the event the conversion privilege was exercised by the holders of

---

[2] The agreement provided in part as follows:

13. Conversion of Notes

13.1. Subject to and upon compliance with the provisions hereof the holder of any Note shall have the right, at such holder's option, at any time on or after the date thereof (except that, with respect to any Note or portion thereof which is to be prepaid upon call for prepayment pursuant to subsection 11.1 hereof, such right shall terminate, with respect to the principal amount of such Note being prepaid, at the close of business on the business day next preceding the particular prepayment date unless the Company shall default in the prepayment due on such date) to convert all or any part of the principal amount of such Note which is $100 or an integral multiple thereof into Common Stock at the price of $7 per share or, in case an adjustment of such price has taken place pursuant to the further provisions of this section, then at the price as last adjusted and in effect at the date such Note or portion thereof is surrendered for conversion (herein called the "conversion price"). In order to exercise such conversion privilege the holder thereof shall surrender such Note to the Company at its principal office in Atlanta, Georgia (or such other office or agency of the Company, located in New York, N.Y., as the Company may designate by notice in writing to the holders of the Notes) accompanied by a written statement designating the principal amount of such Note to be converted, and if any portion of such Note has been called or committed for prepayment pursuant to subsection 11.1 hereof which prepayment has not theretofore been made, stating whether such portion shall be included in the portion of the Note designated for conversion.

the notes. While the notes were outstanding, the agreement provided that C. & S. would not distribute any dividend other than a stock dividend nor "redeem, retire, purchase or otherwise acquire" any shares of its outstanding capital stock. The agreement provided that C. & S. was not to create, incur, or guarantee any long-term indebtedness, excluding its loan agreement with the local bank, to which the notes would be subordinated unless the holders of ⅔ of the outstanding principal amount of the notes gave their prior approval. The agreement provided that C. & S. would not permit any subsidiary to create, incur, or guarantee any liability with respect to any indebtedness unless such was owed to C. & S. or another of its subsidiaries or was an indebtedness of C. & S. guaranteed by such subsidiaries. The agreement provided that neither the corporation nor its subsidiaries were to make investments in or loans to any entity other than a domestic subsidiary of the corporation conducting substantially all of its business within the United States.[3] The

---

[3] The agreement provided in part as follows:

4.9 *"Subsidiary"* means any corporation organized and existing under the laws of the United States or a state thereof or of Canada or a province thereof, having substantially all of its assets and conducting substantially all of its business within the United States and Canada, of which (a) at least a majority of the voting stock, and (b) all stock having any preference over any other class of stock in the payment of dividends or in any liquidation or dissolution is at the time owned by the Company and/or by one or more Subsidiaries. For the purpose of such definition "voting stock" means capital stock the holders of which are ordinarily and generally, in the absence of contingencies, entitled to vote for a majority of the directors or persons performing similar functions.

* * *

15. Short-Term Borrowing; Funded Debt.

15.1 *Indebtedness of the Company.* The Company will not, directly or indirectly, create, incur, assume, guarantee or otherwise become or be liable with respect to any Funded Debt constituting Senior Debt without the prior approval of the holder or holders of 66⅔% or more in principal amount of the Notes at the time outstanding, *provided* that not less than $400,000 aggregate principal amount of Notes are then outstanding. The Company will not, directly or indirectly, create, incur, assume, guarantee or otherwise become or be liable with respect to any Short-Term Borrowing secured by accounts receivable of the Company or any Subsidiary unless the amount of Short-Term Borrowing then committed to the Company with respect to such accounts receivable constitutes not less than 60% of the face amount of all accounts receivable then securing such Short-Term Borrowing.

15.2 *Indebtedness of Subsidiaries.* The Company will not permit any Subsidiary to, directly or indirectly, create, incur, assume, guarantee or otherwise become or be liable with respect to any Short-Term Borrowing or Funded Debt unless the same (a) is owing to the Company or another Subsidiary, (b) is Indebtedness of the Company guaranteed by such Subsidiary or (c) is set forth in the consolidated balance sheet referred to in subsection 5.2.

* * *

18. Investments, Loans, Advances, Guarantees, etc. The Company will not, and will not permit any Subsidiary to, directly or indirectly, purchase or otherwise acquire or own any stock or securities or make or have outstanding any loans or advances (other than down payments or advance payments made in connection with the acquisition of goods or services) or other investments except (a) stock or securities of, and loans and advances to

agreement also provided that the restrictions against borrowings or investment by C. & S. or its subsidiaries were subject to amendment or waiver upon written approval of the holders of $\frac{2}{3}$ of the principal amount of the outstanding notes. Additionally, it provided in part that if the corporation defaulted in the payment of principal of any note or interest on any note for more than 20 days or failed to comply with the restrictions against borrowings or investments by C. & S. or its subsidiaries, the holders of 20 percent of the principal amount of the outstanding notes could at any time during the period of default by written notice to C. & S. declare all notes due and payable without presentment or demand. The agreement provided that its terms were not to be modified or amended except in writing by Associates and C. & S.

In consideration of Associates' purchase of C. & S.'s notes, Mr. Schleppy and Mr. Smith entered into an agreement with Associates dated January 6, 1969, which provided that they jointly and severally unconditionally guaranteed to the holders of the notes the payment of principal and interest as such became due. This agreement further provided that Mr. Schleppy and Mr. Smith jointly and severally agreed that they would not sell or dispose of more than an aggregate of 50,000 shares of common stock of C. & S. prior to January 1, 1970.

In accordance with the agreement, C. & S. sold and Associates purchased on January 10, 1969, $1 million principal amount of 7-percent convertible subordinated notes of C. & S. due January 1, 1974, for the purchase price of $1 million, and 83,333 shares of common stock of C. & S. at par for the purchase price of $500,000.

As of May 22, 1969, David H. Gambrell (Mr. Gambrell), William S. Goedecke, and Carl E. Sanders (Mr. Sanders) were also directors of the corporation. Mr. Gambrell was general counsel and secretary of the corporation.

---

and other investments in, a Subsidiary or a corporation which simultaneously therewith becomes a Subsidiary, (b) direct obligations of the United States of America and prime commercial paper, and (c) stock and securities received in settlement of debts, created in the ordinary course of business, owing to the Company or any Subsidiary. The Company will not, and will not permit any Subsidiary to, guarantee or otherwise incur any contingent liability with respect to any liability, obligation or dividend of any other person except for guarantees represented by endorsements in the ordinary course of business of negotiable instruments for collection and guarantees by a Subsidiary of Indebtedness of the Company.

On April 15, 1969, Mr. Schleppy and Mr. Smith owned 486,500 and 324,000 shares of common stock, respectively, which represented 50.8 and 33.9 percent of the 955,833 shares of stock of C. & S. then outstanding. The outstanding number of shares did not include 175,000 shares reserved for issuance under a stock option plan and the 142,858 shares reserved for conversion of the notes of C. & S. in the event all the notes were converted. As of April 15, 1969, C. & S. had outstanding stock options for 152,100 shares of which only 3,300 were exercisable prior to 1970 and 6,600 were exercisable prior to 1971. Mr. Schleppy and Mr. Smith were not eligible to participate in the stock option plan and Mr. Schleppy did not hold any stock options for stock of C. & S. Mr. Schleppy and Mr. Smith did not acquire or sell any shares of stock of C. & S. during 1969 other than those surrendered by them to the corporation and 1,500 shares that Mr. Smith acquired on December 8, 1969, in which he had a basis of $1,964.25.

During early 1969 the officers and directors of C. & S. considered entering into foreign markets. Prior to May 23, 1969, the officers and directors of C. & S. decided subject to the approval of Associates to engage in foreign sales by organizing one or more wholly owned domestic or foreign subsidiary corporations which would operate in Japan, Thailand, Philippines, Australia, and England. In preparation for entering foreign markets, C. & S. increased the amount of a proposed public offering of 150,000 shares of its stock to 200,000 shares so that the corporation would have the additional amount of $500,000 to provide working capital for its foreign operations.

On May 23, 1969, C. & S. made a public offering of 200,000 shares of common stock at par. In connection therewith C. & S. filed a registration statement with the Securities and Exchange Commission. A prospectus dated May 22, 1969, published with respect to the shares offered to the public, also related to the 175,000 shares reserved for issuance upon the exercise of stock options and the 83,333 shares previously sold to Associates. The prospectus provided that the net tangible book value per share after the offering disregarding any exercise of stock option or conversion privileges was $2.71 based on a balance sheet as of January 31, 1969; the net offering proceeds of $2,217,500 were to be used to reduce the outstanding loans of C. & S. with the local bank which aggregated $3,850,000 as of May 13, 1969; and

that the outstanding number of shares after the offering would be 1,155,833 disregarding the 175,000 shares and 142,858 shares reserved for issuance upon the exercise of all the authorized stock options or upon conversion of all of the outstanding notes, respectively. The prospectus did not disclose that C. & S. was considering entering into foreign markets. It did summarize some of the terms of the agreement of January 6, 1969, and in part provided that under the agreement C. & S. could not "invest in or make loans to other entities, except U.S. and Canadian subsidiaries." Mr. Schleppy and Mr. Smith were generally familiar with the terms of the prospectus.

Following the public offering, C. & S. had 800 to 1,000 stockholders of record.

Subsequent to the public offering, Charles Alling, a nominee of the underwriters of the public offering, became a member of the board of directors of C. & S.

Mr. Schleppy and Mr. Smith believed that C. & S. was prohibited under the terms of the agreement with Associates from investing any capital funds in any new corporation, domestic or foreign, to operate overseas unless C. & S. obtained the approval of Associates. Special counsel to C. & S. for its planned foreign commerce gave his opinion to Mr. Schleppy and Mr. Smith to this effect. Mr. Schleppy advised Associates of the consideration which was being given to the entry of C. & S. into foreign sales operations. Special counsel and Mr. Smith each discussed with Mr. Bensen the plans of C. & S. to invest $500,000 of the proceeds of the public offering in a subsidiary corporation to which a foreign bank that had made a loan commitment of $500,000 would provide additional capitalization of $500,000 through loans. Mr. Bensen, on behalf of Associates, gave his verbal approval to Mr. Smith and special counsel of C. & S. of the planned foreign sales operations of C. & S.

Following a telephone conversation with Mr. Bensen, Mr. Smith transmitted to Mr. Bensen, at his request, a waiver prepared by corporate counsel of C. & S. in the form of a letter to Mr. Smith which was intended upon its execution by Mr. Bensen to amend the agreement of January 6, 1969, so that C. & S. would be permitted to begin foreign operations in the manner it had proposed to Mr. Bensen. This particular waiver which was not ultimately executed by Mr. Bensen provided as follows:

You have informed me of your plans to initiate international operations of Communication & Studies, Inc., via one or more wholly owned domestic and/or foreign subsidiaries, to operate initially in the following countries: Japan, Thailand, Philippines, Australia, and England.

You have indicated your intention to capitalize the subsidiaries, foreign or domestic, with five hundred thousand dollars, and further to provide funds for the international operation in amounts that may be required, from banks domestic and/or foreign.

I, as Vice President of Shareholders Associates, Inc., hereby waive any provisions contained in the agreement dated January 6, 1969, between Shareholders Associates, Inc. and Communication & Studies, Inc., which might restrict or hinder your operating internationally under the proposed methods.

By letter to Mr. Smith dated May 26, 1969, which incorporated the first paragraph of the above-proposed waiver, Mr. Bensen on behalf of Associates agreed to modify the terms of the agreement of January 6, 1969, as follows:

Notwithstanding paragraph 15 of our agreement dated January 6, 1969 between Shareholders Associates, Inc. and Communication & Studies, Inc., we hereby agree that you can borrow up to an aggregate of $500,000 and notwithstanding paragraph 18 of the same agreement that you can invest up to an aggregate of $500,000 in one or more companies to operate in the countries listed in paragraph 1 of this letter and that these companies will not be considered "Subsidiaries" under the terms of our agreement.

In accordance with its proposed plans and its understanding of the agreement as modified by the letter of May 26, 1969, C. & S. organized a subsidiary corporation, Communications & Studies International Ltd., to which C. & S. contributed equity capital of $500,000 from the proceeds of its public offering and to which a foreign bank extended a line of credit of $500,000. Mr. Smith, who was president of the subsidiary, immediately following the modification of the agreement, proceeded to Bangkok, Hong Kong, and Tokyo to set up operations, some of which commenced on approximately June 1, 1969.

C. & S. kept Associates informed of its progress in the development of its foreign sales operations. By letter to Mr. Smith dated July 11, 1969, Mr. Bensen informed C. & S. that the letter of May 26 was intended to permit C. & S. to borrow $500,000 and invest such borrowed funds in one or more companies to operate overseas and not intended to permit the investment of $500,000 and also a guarantee by C. & S. of an additional $500,000 borrowed by the foreign subsidiaries. The letter stated as follows:

This is to confirm that the intention of our letter to you of May 26, 1969 was to permit Communication & Studies, Inc. to borrow up to $500,000 and to invest the borrowed funds in the manner indicated in that letter. It was not our intent to permit the investment of $500,000 and to also permit a guarantee by the parent of an additional $500,000 borrowed by the foreign companies.

By letter to Mr. Bensen dated July 14, 1969, Mr. Smith advised Mr. Bensen that C. & S. had activated a line of credit with international banks for its foreign operations, that he had just returned from the Far East, and Mr. Schleppy was going to England for the purpose of establishing operations there. Mr. Smith explained that any restriction of the planned international expansion of C. & S. at that time would substantially damage the corporation and suggested that, if Mr. Bensen had any reservations concerning the foreign operations of C. & S., Mr. Bensen "fly to Atlanta without delay so that we can more thoroughly communicate to you the facts as they are."

By letter to the corporate general counsel of C. & S. dated August 7, 1969, Mr. Bensen on behalf of Associates consented to a modification of the agreement of January 6, 1969, for C. & S. to enter into a proposed financing arrangement. This modification was qualified as follows:

This consent and modification shall apply only to the arrangement as presented to us. Any material changes in the arrangement must have our prior written approval. Failure to obtain our consent shall constitute an Event of Default under our Loan Agreement.

The officers and board of directors of C. & S. and its special counsel were concerned that since Associates considered C. & S. had violated the terms of the agreement as modified by the letter of May 26, 1969, by its contribution of $500,000 to the capital of its subsidiary and the borrowing of $500,000 by the subsidiary, Associates would declare C. & S. in default so that the notes would become due and payable. The officers of C. & S. considered that a definite possibility existed that Associates might call the loan and that the calling of the loan might force C. & S. into bankruptcy.

A statement dated August 1, 1969, that was attached to the prospectus relating to the public offering of May 23, 1969, did not reveal the concern of C. & S. with the misunderstanding that it perceived had developed with Associates with respect to compliance by C. & S. with the terms of the restrictions of the

agreement of January 6, 1969, as modified by the letter of May 26, 1969.

At the suggestion of a vice president of the local bank, Mr. Schleppy employed William Watson (Mr. Watson) during September 1969 as vice president for finance of C. & S. Mr. Perman, who had been vice president for finance until that time, continued to be treasurer and assistant secretary. The local bank was aware of the misunderstanding between C. & S. and Associates concerning the letter agreement of May 26, 1969. The officers of C. & S. were desirous that its misunderstanding with Associates not affect its arrangements with the local bank which was the primary creditor of C. & S.

In October or November 1969, Associates informed special counsel of C. & S. that it was considering calling the loan and would call it unless some resolution of the dispute were reached. Mr. Bensen later called the special counsel of C. & S. and suggested that the conversion price of the stock of C. & S. for the note should be reduced from $7 to $5 a share.

On December 4, 1969, Mr. Schleppy, accompanied by Mr. Watson, personally met with Mr. Bensen in New York for the purpose of resolving the dispute between Associates and C. & S. over the alleged violation by C. & S. of the restrictions of the agreement as amended. Mr. Bensen indicated that Associates, subject to approval of its parent corporation, would release C. & S. of any violations it may have committed and that the release would be ready the following day. On December 5, Mr. Watson, at Mr. Schleppy's request, went to Mr. Bensen's office to obtain the release. At that time Mr. Watson entered into further negotiations and orally agreed to lower the conversion price of the stock from $7 per share to $5 per share to secure Associates' release. That afternoon Mr. Watson informed Mr. Schleppy of the assurances that he had made on behalf of C. & S. to Mr. Bensen. Mr. Schleppy was surprised by Mr. Watson's commitment and disturbed by it as he realized the effect if the notes were converted at a lower rate. Mr. Schleppy and Mr. Watson returned to Atlanta and informed the other officers and directors of Mr. Watson's commitment to lower the conversion price to $5 per share. On or about December 16, 1969, Mr. Schleppy and Mr. Smith, along with some of the other officers and the directors of C. & S., met to discuss whether C. & S. would ratify Mr. Watson's action or would rescind his oral agreement

which would permit the uncertainty with respect to the alleged violation by C. & S. of the agreement to persist. In the event C. & S. ratified the agreement it would have to have in reserve an additional 57,142 shares for issuance should Associates convert the notes at the lower rate.

During the discussions among members of the board of directors and officers of C. & S. regarding the ratification of Mr. Watson's commitment, corporate counsel of C. & S. and special counsel advised Mr. Schleppy and Mr. Smith that there was a remote possibility that they might be liable to shareholders of C. & S. for mismanagement because of allowing C. & S. to violate the provisions of its agreement with Associates by entry into foreign operations without securing a proper authorization from Associates if to settle the dispute C. & S. agreed to lower the conversion rate of its stock. Both counsel explained to Mr. Schleppy and Mr. Smith that if C. & S. did agree to lower the conversion rate and thereby cause a dilution in value of each shareholder's stockholdings should Associates exercise its conversion rights, they might be liable to the shareholders of C. & S. because of the dilution in value of their C. & S. stock if it were determined that the dilution was due to their mismanagement of the affairs of C. & S.

The general counsel of the corporation, Mr. Gambrell, suggested to Mr. Schleppy and Mr. Smith that if C. & S. did agree to lower the conversion rate to Associates they each contribute sufficient shares of their C. & S. stock to the corporation to offset the amount of any dilution which would be caused should the notes held by Associates be converted into shares at the lower rate. Mr. Gambrell suggested that in this way Mr. Schleppy and Mr. Smith might remedy the cause for any stockholder to file suit against them for dilution of the value of the corporate stock.

Special counsel advised Mr. Schleppy and Mr. Smith that he felt that Associates had no legal right to make the demand it was making, but from a practical viewpoint, whether Associates was right or wrong, if Associates called the note of C. & S. then C. & S. would be in bankruptcy. In the opinion of special counsel C. & S. had no choice but to agree to the lowering of the conversion rate which would mean that Associates would get over 50,000 additional shares of C. & S. stock should it convert the entire amount of the notes to stock. Special counsel and Mr. Sanders pointed out to Mr. Schleppy and Mr. Smith that they held a large

number of shares of C. & S. and though they did not believe they would be held liable for mismanagement should they not contribute the shares to the corporation, if they did contribute back sufficient shares it would remove any such possibility. They also pointed out to Mr. Schleppy and Mr. Smith that they held positions with C. & S. which they ought to protect by avoiding any embarrassment resulting from a lawsuit.

The officers and directors of C. & S., without agreeing with the merits of the position taken by Associates, ratified Mr. Watson's accord with Mr. Bensen to resolve the issue between it and Associates and avoid the possibility of Associates calling notes of C. & S. which they believe would have resulted in the bankruptcy of C. & S. Settlement of the dispute with Associates also removed the necessity of disclosing the misunderstanding with Associates in any subsequent public offering of stock and was pleasing to the local bank which favored acceptance of Mr. Watson's commitment. At the time of their ratification of Mr. Watson's commitment the officers and directors were informed that Messrs. Schleppy and Smith intended to surrender a sufficient number of their shares of C. & S. stock to offset the increased number of shares into which Associates could convert its notes.

Mr. Smith and Mr. Schleppy decided to contribute to C. & S. in proportion to their stockholdings sufficient shares to prohibit any dilution of C. & S. stock that would be caused by the conversion of the notes at the lower rate.

Mr. Watson at Mr. Schleppy's request drafted and sent to Mr. Bensen a written memorandum dated December 12, 1969, of the understanding that he had reached with Mr. Bensen.

On December 20, 1969, Mr. Smith received tax advice from his accountants with respect to his contemplated transfer of some of his C. & S. shares to C. & S. His accountants advised him to transfer such shares in two different taxable years, that is, during 1969 and 1970. Mr. Smith related this advice to Mr. Schleppy.

Mr. Smith kept his own and Mr. Schleppy's certificates representing the shares of C. & S.'s stock that they owned in his safety deposit box at the local bank. On December 16, 1969, following the board meeting, he obtained some of his and Mr. Schleppy's certificates from his safety deposit box. These certificates had a legend stamped on them that indicated that they had not been registered under the Securities and Exchange

Act of 1933. He further obtained an assignment form from a stockbroker.

Mr. Schleppy and Mr. Smith, in anticipation of the finalization of the modifications of the agreement with Associates, each executed an assignment dated December 23, 1969, to sell, assign, and transfer to C. & S. 34,285 and 22,857 shares of C. & S. stock, respectively. By the assignments Mr. Schleppy and Mr. Smith irrevocably appointed Mr. Perman, who attested to Mr. Schleppy's and Mr. Smith's assignment, to transfer such assigned shares on the books of the corporation with the full power of substitution. The shares which Mr. Schleppy assigned were represented by four certificates, aggregating 36,000 shares, that were attached to the assignment. At the bottom of the assignment that Mr. Schleppy executed was the following:

<div style="margin-left:3em">
36,000<br>
<u>34,285</u>  To Communication & Studies, Inc.<br>
  1,715  Reissue to Ronald E. Schleppy
</div>

The shares Mr. Smith assigned were represented by one certificate of 100,000 shares that was attached to the assignment he had executed. At the bottom of this assignment was the following notation in Mr. Perman's handwriting:

<div style="margin-left:3em">
100,000  shs<br>
<u> 22,857</u>  shs To Communication & Studies, Inc.<br>
 77,143  shs Reissue to David N. Smith
</div>

A letter dated December 31, 1969, to C. & S. from Mr. Bensen on behalf of Associates agreed to further modifications of the agreement of January 6, 1969, in accordance with the prior discussions that had been held by the parties in New York. Mr. Schleppy, on behalf on C. & S., executed this supplemental agreement which provided in part as follows:

(a) The conversion price of the Notes as set forth in Section 13 of the Agreement shall be reduced to $5.00 per share of Common Stock of C & S, subject to further adjustment as provided therein.

    * * *

(c) Section 15 of the Agreement shall be amended to read in its entirety as follows:

"The Company will not, and will not permit any Subsidiary to, directly or indirectly, create, incur, assume guarantee or otherwise become or be liable with respect to any Indebtedness for borrowed money constituting Senior Debt in excess of an amount equal to 300% of the sum of (i) Subordinated Debt of the

Company on a consolidated basis at the time outstanding plus (ii) consolidated stockholders equity of the Company determined in accordance with generally accepted accounting principles by independent public accountants as of the most recent certification of the financial statements of the Company by such accountants."

\* \* \*

(e) Section 18 of the Agreement shall be amended by the addition of the following:

"Notwithstanding the foregoing, the Company or any Subsidiary may purchase or otherwise acquire any stock or securities and make loans and other investments in corporations other than corporations which are organized and existing under the laws of the United States or a State thereof or of Canada or a Province thereof having substantially all of their assets and conducting substantially all of their business within the United States and Canada, provided that the sum of the cost of such securities plus the amount of such loans or other investments at the time outstanding does not exceed 50% of the amount of Senior Debt permitted by Section 15 hereof."

(f) The provisions of this Letter Agreement shall supersede all provisions contained in the letters of May 26, 1969 and July 11, 1969 supplementing the Agreement.

\* \* \*

(k) The undersigned and C&S hereby waive all claims and rights arising pursuant to the Agreement by reason of events occurring prior to the date of this Letter Agreement.

If you are in agreement with the foregoing, please sign the form on the enclosed counter part of this letter and return such counter part to the undersigned, whereupon this letter shall become a binding agreement between you and the undersigned.

On November 30 and on December 31, 1969, the quoted respective bid and ask prices for a share of C. & S. stock were $3.75 and $4.25.

Associates never exercised its option to convert its notes into shares. Also, it did not institute a suit against C. & S. for violation of the agreement or make a written communication to that effect. None of the stockholders of C. & S. filed suit against Mr. Schleppy, Mr. Smith, or C. & S.

By two different agreements dated August 21, 1970, Mr. Perman irrevocably appointed Toni Turner his substitute to transfer on the books of the corporation the shares that Mr. Schleppy and Mr. Smith had assigned to C. & S.

The assigned certificates were canceled by the stock transfer agent of C. & S., the local bank, on August 21, 1970.

Mr. Schleppy received a salary from C. & S. for the calendar years 1968, 1969, and 1970 in the amounts of $50,000, $75,000,

and $42,091.66, respectively. Mr. Schleppy's authorized salary for 1970 was $75,000. Mr. Smith received a salary for 1968, 1969, and 1970 in the amounts of $50,031, $54,452.35, and approximately $33,000, respectively. He was authorized a salary of $50,000 for 1970. Mr. Schleppy and Mr. Smith received less than their authorized salaries for 1970 due to the financial circumstances of the corporation in the latter part of 1970. During the latter half of 1970 neither received any salary. They agreed not to receive their authorized salary at that time because of the financial condition of C. & S. C. & S. was liquidated during January 1971.

On January 30, February 2, 3, 4, 6, 11, and 16, and April 2, 1970, Mr. Smith sold restricted stock of C. & S. for a price per share of $2.89, $2.65, $2.40, $2.31, $2.65, $3.87, and $3.81, respectively. The total number of shares sold was 5,300. On August 7, 1970, Mr. Smith sold 1,500 shares of C. & S. stock acquired on December 8, 1969, with an aggregate basis to him of $1,964.25. In their joint income tax return for 1970 the Smiths claimed a miscellaneous deduction for business expenses of $47,400 for the "payment" of 11,800 shares of C. & S. stock in December 1970.

Mr. Smith kept records of his salary, canceled checks, some receipts for expenditures, and a calendar on which was noted the persons with whom he had appointments and whether he was to be out of town. Mr. Smith did maintain an informal but inadequate diary. He made some notations directly on receipts of the purpose for which an expenditure was made. From the information that was available, his secretary would keep a bimonthly record of Mr. Smith's expenditures. Due to his secretary's extended absence from work during 1969, Mr. Smith's recordkeeping system temporarily failed. Consequently, his records had to be reconstructed by his secretary as best she could on her return to work. Mr. Smith made his records available for inspection of respondent's agents and explained to the best of his ability particular records about which the revenue agents inquired. However, he could not always identify the general records. Of the unreimbursed travel and entertainment expenses claimed by Mr. Smith as deductions on his returns, approximately 75 to 80 percent were adequately explained through the notes of Mr. Smith or his secretary.

Petitioners David N. and Judith A. Smith's joint income tax returns for 1966 and 1967 disclosed the following:

|  | *1966* | *1967* |
|---|---|---|
| Business income: |  |  |
| Salary | $43,506.15 | $69,165.18 |
| Nonbusiness income: |  |  |
| Taxable dividends | 2,811.80 | 372.74 |
| Interest |  | 7,389.63 |
| Other | 4,809.49 |  |
| Employee business expenses | (52,417.25) | (62,240.09) |
| Nonbusiness deductions: |  |  |
| Itemized other than casualty | (4,666.08) | (12,844.84) |
| Capital loss in excess of capital gain | (1,000.00) | (1,000.00) |
| Personal exemptions | (1,200.00) | (1,200.00) |
| Net operating loss deduction | 0 | 0 |
| Taxable income or loss | (8,145.89) | (357.38) |

On their joint return for the calendar year 1968 petitioners David N. and Judith A. Smith claimed business expenses in the amount of $53,528 of which $8,882 was for meals and lodging, $1,339 was for travel, $1,000 for food, $1,250 for maid services, $1,200 for liquor, $1,500 for tips, and $500 for taxis. They offset the aggregate amount of expenditures by the amount of $6,455 received for reimbursement. On their joint return for the calendar year 1969 filed August 20, 1970, the Smiths reported a long-term capital gain of $41,415 on the sale of 11,000 shares of C. & S. stock during 1969 for $44,000 that had a cost basis of $2,585. They claimed business expenses of $35,836 of which $417 was for liquor, $1,250 for maid services, $1,000 for food, $4,046 for meals and lodging, and $21,015 for business entertainment and travel. They offset the aggregate amount of business deductions by the amount of $19,283 of reimbursements. The Smiths, on their 1969 return, claimed a miscellaneous deduction of $44,000 with the following explanation attached to their return:

The taxpayer, an officer of Communication & Studies, Inc., made a payment in kind of 11,000 shares of C & S stock to the Corporation in December, 1969, under the following circumstances:

During 1969 a substantial creditor of the Corporation took the position that certain actions of the Corporation were in violation of convertible subordinated notes issued by the Corporation to the creditor. The matter was settled with the creditor on the basis of a reduction of the conversion price contained in the notes. The taxpayer, upon being notified by counsel of possible liability to the Corporation and its shareholders for the events surrounding this transaction

made a contribution of 11,000 shares of common stock to the Corporation with a value of $44,000. This payment was made by the taxpayer in his capacity as an employee of the Corporation solely to prevent damage to his business reputation, to protect his position as an employee, to avoid the considerable expenses of litigation and to prevent embarrassment to himself and his employer. Therefore, the taxpayer hereby claims a deduction for the value of the property transferred ($44,000) as an ordinary and necessary business expense under I.R.C. Section 162.

In his notice of deficiency to David N. and Judith A. Smith, respondent disallowed for 1968 and 1969 those claimed expenses attributable to business entertainment and travel except to the extent Mr. Smith was reimbursed. Respondent disallowed a portion of the business expenses claimed for telephone and auto parking for 1968. Respondent explained that the disallowance was made under section 162 because it has not been established that any amount in excess of that allowed represented unreimbursed ordinary and necessary business expense or was expended for the purpose designated. He further explained that with respect to the travel and entertainment expense disallowed the special substantiation and verification requirements of section 274 had not been met. In computing their tax for 1968 by the income averaging method respondent used the amounts of taxable loss of $8,146 and $357 reported by the Smiths on their tax returns for 1966 and 1967, respectively. For 1969 respondent determined that the Smiths realized a long-term capital loss of $2,585 with respect to the transfer of stock to C. & S. rather than a long-term capital gain of $41,415 and denied the miscellaneous deduction of $44,000 claimed with respect to the transfer of their stock. Respondent explained that it had not been established that any consideration had been received for the transfer or that it was made in connection with Mr. Smith's trade or business. Respondent determined that the long-term capital loss was subject to the limitations of section 1211. In the alternative respondent determined that if a long-term capital gain were realized on the transfer of stock to C. & S., nevertheless the Smiths were not entitled to a miscellaneous deduction for 1969 in any amount with respect to the transfer. Respondent determined an addition to the Smith's tax for 1968 and 1969 under section 6653(a) since part of the underpayment was due to negligence or intentional disregard of rules and regulations.

By an amendment to their petition the Smiths claimed a miscellaneous deduction in 1969 based on the transfer of 22,857

shares of stock to C. & S. at a value of $4 per share. On this basis the Smiths claimed an overpayment of income tax for 1969 and an overpayment for 1968 based on a net operating loss carryback from 1969.

In their joint return for the calendar year 1969 filed September 4, 1970, Ronald E. and Leonette R. Schleppy reported long-term capital gain of $129,083 from the sale for $137,140 of 34,285 shares of C. & S. stock with a cost basis of $8,057. They claimed a miscellaneous deduction of $137,140 and had the same explanation attached to their return that the Smiths had attached to their return for 1969 except for the number of shares transferred to C. & S.

In his notice of deficiency to Ronald E. and Leonette R. Schleppy respondent determined that they realized a long-term capital loss of $8,057 by the transfer of stock to C. & S. rather than a long-term capital gain in the amount of $129,083 and disallowed the claimed miscellaneous deduction in the amount of $137,140. Respondent determined that under the limitations of sections 1211 and 1212, $1,000 of this loss should be carried over to 1970. Respondent explained that it had not been established that the Schleppys received any consideration for the transfer of stock to C. & S. and that the transfer was not in connection with their trade or business.

Respondent by amendment to his answer alleged that if the Schleppys realized a long-term capital gain on the transfer of their stock to C. & S., nevertheless they were not entitled to a miscellaneous deduction in any amount with respect to the transfer of the stock.

<div align="center">OPINION</div>

The legal conclusion to be reached in this case is dependent upon the ultimate factual determination which we make from the underlying facts we have set forth in some detail. Therefore, we will determine our conclusionary facts from the record as a whole before we begin a discussion of the legal principles involved in this case.

From the record as a whole, which consists of lengthy testimony and numerous documents, we conclude that Mr. Schleppy and Mr. Smith considered it necessary to settle the dispute between C. & S. and Associates with respect to any alleged violation by C. & S. of the agreement of January 6, 1969, in order

to preserve the business of C. & S. and avoid possible bankruptcy of that corporation. While the aggregate amount which had been paid by Mr. Schleppy and Mr. Smith for their stock in C. & S. was only $200,000, in their view as of the latter half of 1969 when the disagreement between C. & S. and Associates was still unresolved, the stock of C. & S. that Mr. Schleppy held had a value of approximately $1,850,000 and that which Mr. Smith held had a value of approximately $1,300,000. Also, if the assets of C. & S., upon any forced liquidation, were to be insufficient to pay the loan of Associates and the loan of the local bank, Mr. Schleppy and Mr. Smith were personally liable on both those loans.

We conclude from the evidence as a whole that Mr. Schleppy and Mr. Smith were of the view that it was imperative to settle the dispute between C. & S. and Associates in order to preserve the business of C. & S. which would also preserve their investment therein. They were also of the view in December 1969, that the only way to settle that dispute was to agree to the demand of Associates that the conversion rate of the note held by Associates be reduced from $7 to $5 for a share of C. & S. stock. They also knew that C. & S. might again be considered in violation of the January 6, 1969, agreement if C. & S. did not reserve sufficient stock to provide for the conversion of the entire $1 million note into stock at the lower rate. They also knew that C. & S. did not have the additional stock in reserve without issuing additional stock but that the needed additional reserve could be met by the transfer by them to C. & S. of a relatively small percentage of the stock they held.

While apparently Mr. Schleppy and Mr. Smith had been advised that a remote possibility existed that they might incur some liability to the stockholders of C. & S. if they agreed to reduce the conversion rate of Associates' note from $7 to $5 a share of C. & S. stock in such a way as to cause a dilution of the interest of stockholders, in our view it was not this possibility that was the motivating reason for their transfer of stock to C. & S. They, of course, knew that no such possibility existed unless the Associates' note was actually converted. They also knew that they had reasonably acted in a manner that the board of directors agreed with them was in the best interest of C. & S. in undertaking the activities that caused the dispute between C. & S. and Associates. Since they had concluded that C. & S. could not

reasonably expect to settle its dispute with Associates without agreeing to the reduction in the conversion rate of the note, they decided that the best solution for the protection of the business of C. & S. and their investment therein was to have C. & S. agree to lower the conversion rate for its stock and for them to supply from their large personal C. & S. stockholdings the needed stock to avoid a dilution of the C. & S. shares should Associates decide to convert the note to stock. They had, of course, been advised that by transferring their stock to C. & S. they would avoid any remote possibility of a stockholder's derivative action against them if Associates did convert its note. However, this record is reasonably clear that if C. & S. were thrown into bankruptcy by the calling of the Associates' note, Mr. Schleppy and Mr. Smith would incur so many liabilities superior to any liability to C. & S. stockholders that they could not reasonably have feared such a remote possibility.

Both Mr. Schleppy and Mr. Smith in their testimony insisted that their reason for transferring some of their stock to C. & S. was primarily to preserve their salaries from C. & S. and secondarily to protect themselves against suit by other stockholders, should Associates decide to convert its note into C. & S. stock. While we do not doubt that Mr. Schleppy and Mr. Smith recognized that should C. & S. collapse, their salaried positions with that company would cease, it is clear to us, not only from the entire testimony of these witnesses, but from the testimony of special counsel to C. & S., that the origin of the desirability of making the transfer of stock and the basic reason that Mr. Schleppy and Mr. Smith agreed to make the transfer was to enable C. & S. to agree to reduce the conversion rate of the Associates' note, thereby preserving the business of C. & S. and still having the stock for the conversion reserved as required by the agreement of January 6, 1969. Cf. *Fischer v. United States,* 490 F.2d 218, 222 (7th Cir. 1973). Their action in transferring the stock would, of course, by enabling C. & S. to continue in business, preserve the salaries of Mr. Schleppy and Mr. Smith as long as C. & S. was able to pay their salaries.

The clearest testimony in this record to us is that of special counsel to C. & S. He was involved throughout with the problem of settling the dispute between C. & S. and Associates and also gave advice to Mr. Schleppy and Mr. Smith. His testimony, in effect, spells out the factual conclusions which we have stated

above. He specifically testified that in his opinion the possibility of a stockholder's derivative action being brought against Mr. Schleppy and Mr. Smith was remote and the possibility of any such action being successful was almost nonexistent. Apparently from his testimony he so advised Mr. Schleppy and Mr. Smith. In his testimony he also stressed his advice to Mr. Schleppy and Mr. Smith of the need for C. & S. to resolve its dispute with Associates in order for it to remain in business. He stated almost as an afterthought that of course if C. & S. were liquidated, Mr. Schleppy and Mr. Smith would lose their positions as officers. By our conclusion, we are not, as petitioners' counsel suggests on brief, in effect, stating, that Mr. Smith and Mr. Schleppy were untruthful in their testimony. To them, the preservation of the business of C. & S. without further violation of the January 6, 1969, agreement with Associates which required that C. & S. reserve the stock to meet the conversion of the note held by Associates was likewise a preservation of their positions with C. & S.

Our conclusion is further supported by the actions of Mr. Schleppy and Mr. Smith. In mid-1970, when the financial situation of C. & S. worsened, Mr. Schleppy and Mr. Smith both worked for part of the year with no salary in an effort to preserve the financial stability and business of C. & S. The fact that they worked this period of time for no salary is a further indication that the preservation of the business of C. & S. and their investment therein overrode their interest in a salary from that corporation.

We, therefore, conclude that the underlying reason that Mr. Schleppy and Mr. Smith transferred their stock to C. & S. was to enable C. & S. to settle its dispute with Associates and preserve its financial stability. On this record, we further conclude that Mr. Schleppy and Mr. Smith received no consideration for the transfer of their stock other than the improvement of the financial condition of C. & S. We recognize that by preserving the business of C. & S. they also hoped to preserve their investment in C. & S. and that their transfer of stock to C. & S. might possibly enhance to some extent the value of their remaining shares of stock. The note of Associates was not, in fact, converted to stock of C. & S. However, at the time of the transfer by Mr. Schleppy and Mr. Smith of their stock to C. & S. that corporation was required to hold in reserve stock necessary to permit the

conversion by Associates of its note and that requirement was met by the transfer. Since this stock was to be held in reserve, and might have to be issued to Associates, in our view any enhancement in the value of the remaining shares of stock held by Mr. Schleppy and Mr. Smith was de minimis.

Having reached the ultimate conclusion of fact which we have above stated, we turn now to the tax effects of this conclusion.

Petitioners argue that their purpose in contributing the shares to C. & S. was to protect their salaries and therefore they are entitled to deduct the fair market value of the shares contributed as an expense of protecting their employment. Our conclusion as to the primary reason for their transfer of the shares to C. & S. disposes of this issue. Cf. *W. W. Windle Co.,* 65 T.C. 694 (1976). This conclusion also disposes of the claim of the Smiths that they are entitled to a net operating loss carryback to 1968 because of the deduction of the value of the stock contributed to C. & S. in 1969.

Although Mr. Schleppy and Mr. Smith each included in the income reported on their returns capital gain from the sale or exchange of the stock transferred to C. & S., each of them now claims that he did not realize any gain during that year from such transfer.

Respondent's primary contention is that the assignments of C. & S. stock to C. & S. by Mr. Schleppy and Mr. Smith were contributions to capital so that no gain or loss should be recognized on the transfers. If we conclude that the assignments did not constitute contributions to capital, respondent's alternative position is that Mr. Schleppy and Mr. Smith are entitled to a long-term capital loss for the calendar year 1969 in an amount equal to their cost basis in the stock transferred to the extent allowed under section 1211 and that Mr. Schleppy is entitled to a long-term capital loss carryover to the year 1970 to the extent allowed under section 1212. Respondent contends that Mr. Smith did not transfer more than 11,000 shares of C. & S. stock to C. & S. in 1969 and therefore did not sustain a net operating loss in 1969.

While the net operating loss issue is disposed of by our conclusion of fact, it is still necessary to determine the number of shares transferred by Mr. Smith to C. & S. in 1969 if we conclude that he had either an ordinary or capital loss in that year of the basis of the shares transferred. The factual basis for respondent's

singling out part of Mr. Smith's shares as not having been transferred in 1969 is primarily the fact that Mr. Smith on his 1969 return reported only 11,000 shares as having been transferred to C. & S. However, in an amendment to petition the Smiths allege that in fact Mr. Smith transferred 22,857 shares of C. & S. stock to C. & S. in 1969. In considering respondent's contention, we must of necessity consider whether in fact a complete transfer of any shares of C. & S. stock was made by Mr. Smith to C. & S. in 1969. The facts in this respect are the same as to Mr. Schleppy and Mr. Smith.

The record shows that Messrs. Schleppy and Smith executed separate assignments, dated December 23, 1969, to sell, assign, and transfer to C. & S. 34,285 and 22,857 shares, respectively, of C. & S. stock which shares were represented by certificates attached to such assignments and that each of them irrevocably appointed Mr. Perman or his substitute to transfer such shares on the books of the corporation. While the record is not free from doubt, we conclude that the executed assignments were delivered to Mr. Perman with the certificates attached on December 23, 1969. The certificates were removed from Mr. Smith's safety deposit box on December 16 and the intention of each Mr. Schleppy and Mr. Smith was to make an assignment of portions of the shares that these certificates represented in anticipation of the formal ratification of the oral agreement with Associates which C. & S. had informally approved. C. & S. formally ratified its agreement with Associates on or shortly after December 31, 1969. Messrs. Schleppy and Smith apparently retained legal title to the shares they assigned to C. & S. until August 21, 1970, when the certificates representing these shares were canceled by C. & S.'s stock transfer agent and new certificates were apparently reissued to each of them and C. & S. However, upon the execution of the assignments on December 23, 1969, C. & S. became vested with the equitable ownership of the shares assigned to it. At that time, C. & S. became entitled to have such shares formally registered in its name and stock certificates issued to it. The fact that the stock certificates representing the assigned shares were not issued to C. & S. at the time of the assignments is immaterial in determining the ownership of the assigned shares. Mr. Perman, who was appointed to transfer such shares, had the fiduciary duty in his capacity as a corporate officer to have the assigned shares transferred to C. & S. on the corporate books. Respondent argues

that the transferred shares were to be retained in an escrow account by C. & S. as an agent for Messrs. Schleppy and Smith only to be transferred to C. & S. and reissued upon Associates' exercise of its right of converting the notes of C. & S. that it held into shares of C. & S. stock at the lower conversion rate. Since the assignments to C. & S. unconditionally conveyed Messrs. Schleppy's and Smith's ownership interest in the assigned shares, it is clear that C. & S. was not acting as the escrow agent of Messrs. Schleppy and Smith with respect to such shares.

Having found that Messrs. Schleppy and Smith assigned 34,285 and 22,857 shares, respectively, of C. & S. stock to C. & S. on December 23, 1969, and that the assignment was not business related in such a manner as to entitle either of them to a deduction for the fair market value of the stock, we must decide whether Mr. Schleppy or Mr. Smith realized any gain or sustained any loss on the transfer of his respective shares of C. & S. stock to that corporation and if so the nature and amount thereof.

Respondent contends that Messrs. Schleppy's and Smith's transfers of some of their shares of C. & S. stock to C. & S. were nontaxable contributions to capital.[4] We do not agree. It is well established that where a stockholder of a corporation surrenders some of his stockholdings to such corporation without consideration and such surrender results in a change of his proportionate ownership interest in that corporation, the stockholder is not treated as having made a contribution to capital but realizes any loss occasioned upon the surrender of such shares. *Estate of William H. Foster,* 9 T.C. 930, 934 (1947); *Julius C. Miller,* 45 B.T.A. 292, 298-299 (1941). See *Helene Baldwin Burdick, Executrix,* 20 B.T.A. 742 (1930), affd. 59 F.2d 395 (3d Cir. 1932).[5] It is only where all the shareholders transfer a portion of their shareholdings on a pro rata basis that we have determined a nontaxable contribution to capital results. *Bed Rock Petroleum Co.,* 29 B.T.A. 118 (1933); *Charles M. Haft,* 20 B.T.A. 431, 436-437 (1930); *Edith Scoville,* 18 B.T.A. 261

[4] Respondent relies on Rev. Rul. 69-368, 1969-2 C.B. 27, to support this position. If this revenue ruling does in fact refer to a non-pro-rata transfer of stock by a shareholder to a corporation without consideration, it is contrary to the holdings of a number of cases decided by this Court which are not referred to therein.

[5] Similarly, a shareholder of a corporation who for consideration transfers a portion of his shares to a third party, although the transfer benefits the corporation, realizes gain or loss on the exchange. *J. K. Downer,* 48 T.C. 86, 91-92 (1967).

(1929). Here Messrs. Schleppy and Smith assigned to C. & S. 34,285 and 22,857 shares, respectively, of their C. & S. stock. At the time of the assignments Messrs. Schleppy and Smith owned 486,500 and 324,000 shares, respectively, of the 1,155,833 outstanding shares of C. & S. stock. The remaining shares were owned by more than 800 other stockholders. None of the other more than 800 stockholders of C. & S. stock transferred any shares of their stock to C. & S. Messrs. Schleppy and Smith made a non-pro-rata contribution of stock to C. & S. and their owner-ship interest in the corporation diminished in relation to the other shareholders of the corporation. Consequently, we conclude that the assignments of such shares of stock to C. & S. by Messrs. Schleppy and Smith were not contributions to capital.[6]

Where a stockholder surrenders some of his shares dispropor-tionately with respect to other shareholders to the issuing corporation for no consideration other than whatever enhancement in the book value of his retained shares results from such surrender, he realizes an ordinary loss since the transaction does not constitute a sale or exchange. *Estate of William H. Foster, supra; Budd International Corp.,* 45 B.T.A. 737, 755-756 (1941), revd. on other grounds 143 F.2d 784 (3d Cir. 1944); *Julius C. Miller, supra; Northwest Motor Service Co. v. United States,* (D. N.Dak. 1960, 5 AFTR 2d 1557, 60-2 USTC par. 9488). Where a stockholder surrenders some of his shares disproportionately with respect to the other shareholders to the issuing corporation for consideration, the transaction constitutes a sale or exchange of the shares and he realizes capital gain or loss, assuming that the shares are a capital asset in his hands, measured by the difference in the amount received and the adjusted basis of the shares transferred. *J. K. Downer,* 48 T.C. 86 (1967).[7]

We must initially determine whether petitioners realized gain or loss on the transfers. Although on their return petitioners treated the transfer of their C. & S. shares as resulting in capital gain, they now argue that they did not realize any gain since no consideration accrued to them at the time the shares were assigned. The consideration which it might be argued that Mr. Schleppy and Mr. Smith received by transfer of their stock to C. & S. was (1) a release from any contingent tort liability to which

---

[6] See *Charles H. Duell,* T.C. Memo. 1960-248.
[7] See also *Thomas S. Crow,* T.C. Memo. 1970-283.

they might have been exposed for any mismanagement of C. & S. by not having secured the unequivocal approval of Associates for the manner in which C. & S. chose to conduct its foreign operations or for their allowing C. & S. to reduce the conversion rate, which upon Associates' conversion of its notes to stock would have resulted in the dilution of the ownership interest of C. & S.'s stockholders, and (2) the assurance that the agreement of C. & S. to lower the conversion rate would result in Associates not calling its loan to C. & S. thereby precipitating the financial collapse of C. & S. with the resultant loss by Mr. Schleppy and Mr. Smith of their status as salaried corporate officers and their possibly becoming liable under the terms of their guarantee for the notes of C. & S. for its outstanding loans.

In our view there existed no liability of Mr. Schleppy and Mr. Smith to other shareholders for dilution of their C. & S. stock at the time of the transfer. No such liability could possibly arise until Associates chose to convert its notes to stock of C. & S. With the value of the C. & S. stock clearly below the $5 conversion rate in December 1969,[8] no such liability then existed. Furthermore, in our view the actions of Mr. Schleppy and Mr. Smith were clearly in the best interest of C. & S. since failure to resolve the dispute with Associates could lead to C. & S. becoming bankrupt. The main advantage in assuring that Associates would not call the note of C. & S. was the advantage to the corporation itself, the primary obligor on the notes. In our view the incidental advantage to Mr. Schleppy and Mr. Smith as stockholders is not consideration flowing from the corporation to which the stock was transferred to the transferors of the stock.

The instant case is factually more comparable to *Estate of William H. Foster, supra,* than to *J. K. Downer, supra.* In the *Downer* case, a major stockholder transferred stock to a third party in consideration for the third party performing services for the corporation. There the consideration for the transfer flowing from the transferee of the stock to the transferor was clear. Here the results of the transfer of the stock of C. & S. to the corporation were to benefit the corporation by facilitating its entering into an agreement beneficial to it. As we stated in *Estate of William H. Foster,* 9 T.C. at 934:

---

[8] Mr. Schleppy and Mr. Smith claim the value of the stock in December 1969 was $4 a share, but in our view the value at that time was less than that amount.

Generally, a payment by a stockholder to the corporation, made to protect and enhance his existing investment and prevent its loss, is a capital contribution, rather than a deductible loss, and should be added to the basis of his stock. He increases his capital investment and the determination of gain or loss is held in abeyance until disposition of some or all of his stock. *First National Bank in Wichita v. Commissioner,* 46 Fed. (2d) 283, affirming *W. R. Ranney,* 16 B.T.A. 1399; *B. Estes Vaughan,* 17 B.T.A. 620. On the other hand, when a stockholder surrenders a part of his stock to improve the financial condition of the corporation he sustains a deductible loss, measured by the basis of the stock surrendered, less the resulting improvement in value of the stock retained. *Commissioner v. Burdick,* 59 Fed. (2d) 395, affirming 20 B.T.A. 742; *Julius C. Miller,* 45 B.T.A. 292; *Peabody Coal Co. v. United States,* 8 Fed. Supp. 845.

We, therefore, conclude that Mr. Schleppy and Mr. Smith are each entitled to a loss in the amount of his basis in the stock he surrendered to C. & S. less any resulting improvement in the value of his remaining stock.

Since the stock that Mr. Schleppy and Mr. Smith surrendered was to be reserved by the corporation to be used in the event of conversion of the note of Associates to stock, in our view any resulting increase in value in the remaining stock held by Mr. Schleppy and Mr. Smith was de minimis. See *Budd International Corp., supra.* We, therefore, conclude that Mr. Schleppy and Mr. Smith are each entitled to a loss in 1969 of his basis in the stock he surrendered to C. & S.

Although the stock of C. & S. was a capital asset held by each Mr. Schleppy and Mr. Smith, in our view neither of them made a "sale or exchange" of his stock. Since there was no sale or exchange, the amount of the basis of the stock transferred by each to the corporation is the measure of the deduction to which he is entitled because of the transfer. *City Builders Finance Co.,* 21 B.T.A. 800 (1930). Since Messrs. Schleppy and Smith each sustained an ordinary loss in 1969, measured for each by the basis of stock he surrendered to C. & S. in that year, he is, of course, not entitled to the capital loss for 1969 determined by respondent of his basis in this stock and Mr. Schleppy is not entitled to the capital loss carryover to 1970 determined by respondent.

Section 6653(a) provides for an addition to income tax if any part of an underpayment of that tax is due to negligence or intentional disregard of respondent's rules and regulations. Respondent in his notice of deficiency to the Smiths determined an addition to tax under section 6653(a) for each of the years 1968 and 1969.

When respondent has determined an addition to tax under section 6653(a), the burden is upon the taxpayer to show that the addition is improperly imposed. *Herbert Enoch,* 57 T.C. 781, 802-803 (1972); *David Courtney,* 28 T.C. 658, 669 (1957).

The Smiths contend that Mr. Smith maintained adequate records reflecting their items of income and expense. Respondent contends that the Smiths did not keep adequate records particularly with respect to substantiating Mr. Smith's claimed business expense deductions, including his claimed deductions for travel and entertainment expenses. Due to previous audits of his returns Mr. Smith was aware of respondent's recordkeeping requirement for substantiation of his claimed business expense deductions. Mr. Smith maintained records of his salary, canceled checks, receipts, a business appointment calendar, and a noncomprehensive diary. However, these records were not sufficiently detailed to support a number of the deductions he claimed that were disallowed in the notice of deficiency for lack of substantiation. Mr. Smith testified that 75 to 80 percent of his claimed unreimbursed business expenses for 1968 and 1969 were adequately explained by his records. However, he did not produce at the trial the records he claimed were adequate. On the basis of this record, we conclude that the Smiths have failed to show error in respondent's determination of the addition to tax under section 6653(a).

The Smiths' reliance on *John Robinson,* 51 T.C. 520 (1968), affd. per curiam 422 F.2d 873 (9th Cir. 1970), is misplaced. In that case we found as a fact that the taxpayer kept records showing his income, various office expenses, and other expenses, which were sufficiently accurate to show all items of income and no duplication of deductions.

The facts here do not show that the Smiths' records were adequate under respondent's regulations or that the Smiths' failure to keep adequate records was not negligent. We, therefore, conclude that respondent properly determined an addition to the Smiths' income tax for the calendar years 1968 and 1969 under section 6653(a).

*Decisions will be entered under Rule 155.*