HENRY C. TILFORD, JR., AND BARBARA N. TILFORD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1334–77.    Filed October 20, 1980.

*H. Wayne Grant, Howell G. Clements, John T. Henniss,* and *James L. Bomar,* for the petitioners.

*John B. Harper,* for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' income tax as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1966 | $4,467.67 | 1970 | $3,644.06 |
| 1967 | 1,235.71 | 1972 | 68,650.84 |
| 1969 | 58,372.10 | 1973 | 46,897.37 |

Due to concessions by petitioners, the only issues remaining for our consideration are:

(1) Whether section 83[1] denies petitioner a loss on the sale of stock of a corporation, in which he was the majority shareholder,

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as in effect during the years at issue.

made to employees of the corporation in order to induce them to work for it.

(2) Whether respondent correctly determined the excess deductions account for purposes of section 1251.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference.

Petitioners Henry C. and Barbara N. Tilford filed joint income tax returns for the years 1966, 1967, 1969, and 1970 with the Southeast Service Center, Chamblee, Ga. They filed their joint income tax returns for 1972 and 1973 (as amended) with the Memphis Service Center, Memphis, Tenn. At the time they filed their petition herein, petitioners resided in Shelbyville, Tenn. Barbara N. Tilford is a petitioner herein only because joint returns were filed for the years in issue. Therefore, references to "petitioner" will be to Henry C. Tilford, Jr.

## Issue 1. Capital Loss Deductions

Watco, Inc., is a Tennessee corporation, chartered in November 1968. Its principal offices are located in Shelbyville, Tenn. Watco is primarily engaged in the manufacture and sale of commercial signs.

Petitioner has been a principal officer and either the sole or majority shareholder of Watco since its incorporation. In most years, petitioner was Watco's president, and during the years in issue was chairman of the board of directors. By December 31, 1970, petitioner had invested $350,000 in Watco stock, owning 100 percent of its 170,000 issued shares, and had loaned it an additional $79,500.

Watco was started by petitioner and a friend, Eddie Watson. Petitioner was to put up the money, and Watson was to manage the company. When the company began operations, it manufactured a "vacuum form magnetic" sign which is affixed to the sides of trucks and cars to identify a business. It rented a small building and hired two employees. During 1969, the company grew to three or four employees but was losing money because of inadequate sales. By 1970, Watson had talked petitioner into enlarging the business to manufacture electric trailer signs in

hopes of generating greater sales and earning a profit. This expansion necessitated the hiring of more employees and a move to a larger building.

Neither Watson nor petitioner had any knowledge or experience in manufacturing signs, and petitioner had to hire experienced personnel to manage both the manufacturing and marketing aspects of the company, as well as for administrative functions. As an inducement in hiring these key personnel—Pat Driscoll, Dorothy Haithcote, and Ronnie Besaw—they were told that they would eventually participate as owners in the business.

On March 29, 1971, petitioner sold portions of his Watco stock for $1 per share to Driscoll (4,500 shares), to Besaw (3,500 shares), to Haithcote (500 shares), to Mays Montgomery, a commercial salesman (750 shares), and to Ben Kingree, petitioner's attorney, who was also a director of Watco (750 shares). Each purchaser paid a total of $1 per share for all of the shares acquired. The amount of shares sold to each individual was based upon what petitioner considered to be his relative importance to the company. An additional 100 shares were sold in 1971 to Bayard Tarpley, a retired attorney who had previously done some work for both petitioner and Watco.

Petitioner considered it to be advantageous for these employees to be shareholders, and he sold the stock for $1 because he believed it had no market value. Petitioner reserved a right of first refusal to repurchase the stock at book value within 5 years in the event that a purchasing employee desired to sell his stock or in the event his employment with Watco was terminated (voluntarily or otherwise). The stock sold was deposited in escrow with the Peoples National Bank of Shelbyville in order to assure petitioner his rights under the contract.[2] Additional stock was sold to Driscoll and Haithcote on December 22, 1972, on

---

[2] These contracts typically stated, in pertinent part, as follows:

"H. C. TILFORD, JR., has this day sold to ____ , ____ , ____ , ____ shares of the common capital stock of Watco, Inc. for the consideration of $1.00 and for further consideration of affording ____ an opportunity to acquire a financial interest in Watco, Inc., by which he is being employed.

"This stock is sold with the express understanding and agreement that in the event the purchaser should at any time within five (5) years from date either (1) desire to sell said stock, or (2) terminate his employment with Watco, Inc. either voluntarily or otherwise, the said H. C. Tilford, Jr., shall be accorded the first right of refusal to purchase said stock at a price equivalent to its then existing book value as determined by Watco, Inc. accounting firm. Upon the transfer of this stock to purchaser, the purchaser shall thereupon endorse the stock certificate in blank and deposit same in escrow for a period of five (5) years with the Peoples

similar terms, although the contract with Haithcote had the additional provision that after 5 years, in the event Haithcote desired to sell the stock to a third party, petitioner had a right of first refusal to buy the stock at the price Haithcote was offered by the third party.

Watco continued to lose money after these employees were hired, and it had to borrow funds for current operations. Petitioner was required to guarantee these borrowings, as well as Watco's accounts payable, because of its poor financial condition, and by the end of 1971, the total amount guaranteed was over $300,000. Eventually, petitioner guaranteed over $900,000 of Watco's loans and accounts payable.

Due to large losses, petitioner considered selling, merging, or liquidating the business in late 1971, and hired a consultant, Barry Winston, for advice. After reviewing Watco's balance sheet, personnel, and facilities, Winston told petitioner he had to find a knowledgeable person to manage the company; otherwise, if he could not sell it, he should liquidate. Petitioner did not desire to liquidate the company, and Winston was then asked to find a qualified manager.

Winston also explored possibilities of merging with Winkler Sign Corp. but that transaction, as well as a possible sale to United Advertising Co., never materialized. There was one other company which looked seriously at the prospect of purchasing Watco, but it eventually rejected the idea because it determined that Watco was not a good investment.

After several months, in September 1971, Watco hired Nelson Early under a 2-year employment contract to help manage the company. At the time, petitioner told Early he thought Early should also become a shareholder in Watco, and in November 1971, petitioner sold Early 5,000 shares for $1 on the same terms as the previous sales. Petitioner also told Early that he would provide the additional capital that Watco needed in order to continue operations and expand.

After he hired Early, petitioner received an application for the job from Tom Watson. Watson came highly recommended and, after negotiations, was hired in late 1971. As part of his

---

National Bank of Shelbyville, Tennessee, to assure the performance on the part of the purchaser of the convenant relating to the first right of refusal to purchase same."

employment terms, Watson demanded stock in the company and in November 1971 purchased 22,000 shares from petitioner for $1 on the same terms as the previous sales. Petitioner assured Watson, moreover, that he would continue to put up money for the corporation. Watson then hired Leo Pitt; 4,000 shares were also sold to him at $1 in order to induce him to come to work for Watco. Pitt's contract concerning the Watco shares was similar to the previous contracts except that one of petitioner's rights was described as a "right at his sole option to repurchase stock" rather than a "right of first refusal." It also contained a provision that if the stock was transferred without petitioner's being accorded the right to repurchase the stock, Watco had the right to refuse to transfer any stock certificate on its stock ledger. When Pitt left Watco in late 1972 or early 1973, petitioner repurchased the stock for $1. Pitt believed it had no value at that time.

Sales increased in 1972, and Watco expanded to about 40 employees. In order to obtain the sales, however, Watco was required to sell its signs below cost, and substanital losses were incurred. Watson then brought in an expert in manufacturing to reduce costs. Early then became disenchanted because of Watson's control and left Watco, pursuant to a mutually agreed upon recision of his contract. Early sold his shares back to petitioner for $1.

Watson also left later, due to personal problems, and sold back his shares to petitioner for $1. Petitioner, in turn, in October 1972, sold 18,000 of these shares to Robert Price (one of the original employees of the company) for $1. Petitioner later sold an additional 9,000 shares to Price for $1.

Watco hired Tom Cannon in 1973 to manage its national sales. Petitioner sold Cannon 24,500 shares of Watco for $1. In addition to the terms set forth in the original agreements, the stock was to be escrowed for 6 years instead of 5, and petitioner had the right to repurchase the stock at $1 if Cannon left Watco within 1 year. After 5 years, petitioner had the right of first refusal to repurchase at any price Cannon could otherwise obtain.[3] Cannon

---

[3]The contract read, in pertinent part:

"This stock is sold subject to the following terms and conditions:

"A. That the parties hereto agree that in the event the Purchaser shall at any time within one (1) year from the date of the execution of this agreement either (1) desire to sell the subject stock or (2) terminate his employment with WATCO, INC., either voluntarily or otherwise, the

then hired two salesmen, Jim McMullen and Jim Marren, who were also offered, and purchased from petitioner, 24,500 and 14,700 shares in Watco, respectively, for $1 and on the same terms Cannon purchased his stock. Petitioner assured these two salesmen that he would continue to commit his personal resources to keep Watco going. Without this commitment, they would not have agreed to come to work for Watco. After these three individuals were hired, sales increased, but expenses also increased, and Watco continued to lose money.

Price eventually decided to retire and, pursuant to petitioner's right of first refusal, sold back his 27,000 shares in Watco to petitioner for their book value, a total of $9,318.55. McMullen, Cannon, and Marren also eventually decided to leave Watco, and each sold his stock back to petitioner for $1.

Petitioner claimed losses from the sales of Watco stock to Tarpley, Kingree, and the key employees, except for the stock sold to Price (since he had repurchased these shares from Watson for $1 and, therefore, had a basis of only $1). Respondent disallowed the deductions for the losses and determined the sales to be transfers of property in connection with the performance

---

said H. C. TILFORD, JR. shall be accorded the right to repurchase said stock for the price of One ($1.00) Dollar.

"B. That the parties hereto agree that in the event the Purchaser should at any time within the next five (5) years thereafter from the date of termination of the one (1) year period set forth in (A) above, either (1) desire to sell the subject stock or (2) terminate his employment with WATCO, INC., either voluntarily or otherwise, the said H. C. TILFORD, JR. shall be accorded the right at his sole option to repurchase the subject stock at a price equivalent to the then existing book value of the subject stock, as determined by accountants of or selected by WATCO, INC.

"C. That upon the transfer of the stock to the Purchaser the Purchaser shall endorse the stock certificate in blank and deposit the same in escrow for a period of six (6) years with the Peoples National Bank of Shelbyville, Tennessee, as Escrow Agent. The parties hereto agree that this provision assures the performance on the part of the Purchaser of the covenants stated in paragraphs "A" and "B" above relating to Tilford's sole option to repurchase the subject stock.

"D. That after six (6) years from the date of this contract, the Purchaser shall be permitted to sell said stock to third parties. However, he shall first offer said stock to the Seller at a price equivalent to that which he proposes to receive from said third parties, and the Seller shall have ten (10) days to purchase said stock at said price. If the Seller does not exercise this option to purchase, then, the Purchaser shall be free to sell said stock to third parties at said price, but he shall not sell said stock to third parties at a lesser price than originally offered unless he first gives to the Seller a ten (10) day option to buy same at said lesser price.

"E. That in the event the subject stock should be transferred to a third party without Tilford's being accorded the option to purchase stated in paragraphs "A", "B", "C", and "D" above, WATCO, INC. shall have the right to refuse to transfer any stock certificates, so transferred on the stock ledger of the corporation."

of services that must be treated as contributions to capital of Watco under section 83.

## Issue 2. Income From Farm Recapture Property

Bedford Farms, Inc., is a Tennessee corporation chartered on April 26, 1960. It owns and operates a farm of approximately 1,000 acres near Shelbyville, Tenn. On January 5, 1966, Bedford Farms elected tax options status under section 1372. The corporation's business activities during the years in question included selling farm products, renting farm property and equipment, and raising and selling cattle and other livestock.

During the years in question, Bedford Farms had outstanding 750 shares of common stock, owned as follows:

| Shareholder | Shares |
|---|---|
| Henry C. Tilford, Jr. | 739 |
| Barbara N. Tilford | 10 |
| Henry C. Tilford III | 1 |

On its 1973 income tax return, Bedford Farms reported taxable income of $119,150.27. It reported a sale of breeding stock at a gain of $269,905.02. Of this amount, $40,829.03 was reported as ordinary gain, and $229,075.99[4] was reported as capital gain, both of which were used to arrive at taxable income. On Schedule K (Computation of Undistributed Taxable Income and Summary of Distributions) of Bedford Farms' Form 1120S, the corporation's undistributed taxable income is listed as $119,150.27. All of this amount is listed as undistributed taxable income taxable as long-term capital gain.

In the notice of deficiency to petitioner, respondent determined that $51,436.70 of a long-term capital gain reported as petitioner's distributive share of the capital gains of Bedford Farms, Inc., should have been reported as ordinary income under the farm loss recapture of section 1251. Accordingly, petitioner's capital gains were reduced, and his share of the undistributed taxable income of Bedford Farms was increased. The parties agree that the figures used by respondent in making this determination are correct but do not agree that respondent's method of computation, and, therefore, the results of the

---

[4] The return shows $229,175.99, which is $100 in error.

computation, are correct. The following is respondent's computation of the 1973 increase in Bedford Farms' ordinary income for 1973, as set forth in the notice of deficiency:

COMPUTATION OF ORDINARY INCOME UNDER THE RECAPTURE PROVISIONS OF SECTION 1251, IRC OF BEDFORD FARMS, INC.

Since the nonfarm adjusted gross income of the major shareholder, Henry C. Tilford, Jr., plus the nonfarm adjusted gross income of Bedford Farms, Inc. (none exceeded $50,000.00) in each of the taxable years 1972 and 1973, and Bedford Farms farm net loss for each of those years exceeded $25,000.00, the recapture of farm loss provisions of section 1251 applies and gain from farm recapture property of $161,439.05 is reclassified as ordinary income for the taxable year 1973, as detailed below.

|  | 1972 | 1973 |
|---|---|---|
| Farm net loss: | | |
| Total income shown in return, Form 1120S | $128,434.33 | $372,157.96 |
| Less gain on disposition of farm recapture property referred to in sec. 1231(a)— excluded from computation under sec. 1251(e)(2) | 20,169.14 | 229,075.99 |
| Gross farm income as adjusted | 108,265.19 | 143,081.97 |
| Less deductions: | | |
| Total deductions shown in schedule $212,693.60 | | $253,007.69 |
| Less insurance expense disallowed; This report 1,450.36 | | 1,462.72 |
| Farm deductions as determined | (211,243.24) | (251,542.97) |
| Farm net loss as determined | (102,978.05) | (108,461.00) |
| Less exclusion provided by sec. 1251(b)(2)(B)(ii) | 25,000.00 | 25,000.00 |
| Addition to excess deduction account for each year | (77,978.05) | (83,461.00) |

Balance in excess deduction account at the end of 1973 to be recaptured as ordinary income from the sale of farm recapture property during that year:

| | |
|---|---|
| Balance in EDA account at 1/1/73 as determined above | $77,978.05 |
| Addition to the account for 1973, as shown above | 83,461.00 |
| Balance in EDA account at 12/31/73 and gain recognized as ordinary income under sec. 1251(c)(1) | 161,439.05 |

Respondent decreased Bedford Farms' net long-term capital

gain from $229,075.99 by this $161,439.05 to $67,636.94 and increased ordinary income of $40,829.03 by the same $161,439.05. The effect was to change $52,978.05 of the $120,614.99 taxable income of Bedford Farms from long-term capital gain to undistributed taxable income.[5] Petitioner's share of the undistributed taxable income was determined to be $52,907.41.

Respondent then reduced the $119,150.27 reported on petitioner's 1973 return as net long-term capital gain from Bedford Farms by $51,436.70. This was done by first subtracting the portion of Bedford Farms' capital gain respondent attributed to petitioner's son, $166.81, and then by subtracting petitioner's share of the net long-term capital gain derived from the sale after application of section 1251.

## OPINION

### Issue 1. Capital Loss Deductions

Petitioner transferred stock in his corporation, subject to certain restrictions, to certain key employees to induce them to remain with, or to come to work for, the corporation. Many of these employees were promised, at the time of receipt of the stock, that petitioner would continue to apply his personal resources to Watco in order to keep it operating in the face of large operating deficits. The number of shares transferred to each employee was based upon the importance of the employee to the company, and petitioner considered it important for the key employees to have a proprietary interest in Watco. Petitioner claimed loss deductions on his income tax return with respect to these transfers of shares.[6]

The instant case is similar in its facts to *Downer v. Commissioner*, 48 T.C. 86 (1967). There, the taxpayer, the majority shareholder of a corporation, transferred 100,000 shares of stock in the corporation to an employee of the corporation to induce

---

[5]$119,150.27, as reported, plus $1,464.72, representing a deduction claimed for insurance premiums disallowed by respondent, not in dispute here.

[6]Petitioner's primary contention is that the transfers amounted to sales of the stock, giving rise to deductions under sec. 1002. Alternatively, petitioner claims ordinary loss deductions on the theory that, in substance, the stock was surrendered to the corporation for use as employee compensation, and such a transaction is not a sale or exchange. See *Smith v. Commissioner*, 66 T.C. 622 (1976), revd. sub nom. *Schleppy v. Commissioner*, 601 F.2d 196 (5th Cir. 1979); *Estate of Foster v. Commissioner*, 9 T.C. 930 (1947).

the employee to continue work. The taxpayer's basis in the 100,000 shares was $100,000, and the shares had a fair market value of $15,000. We held that the taxpayer did not make a capital contribution to his corporation of the 100,000 shares, as the Commissioner contended, but rather, the transaction constituted a "sale or exchange," and the taxpayer suffered an $85,000 capital loss. In the instant case, the facts are similar except that petitioner transferred the stock subject to certain restrictions imposed on the transferees, while in *Downer*, there apparently were no such restrictions. Respondent, however, does not attempt to distinguish *Downer* on that basis, but rather, maintains that regardless of the *Downer* facts and the *Downer* result, the transactions in the instant case fall under the rules of section 83, which was not in effect at the time of the *Downer* case.

Section 83 was added to the Internal Revenue Code by the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 588, and it applies (with certain transitional exceptions) to transfers after June 30, 1969. This section deals with the tax consequences of transfers of property in connection with the performance of services, and it was enacted primarily to deal with certain so-called "restricted stock" compensation plans. In general, section 83 provides that property received for the performance of services is to be included in the income of the recipient (at its fair market value); however, if the property is not freely transferable by the recipient, or is subject to forfeiture, the value of the property is determined and taken into income only upon the termination of such restrictions. In addition to prescribing rules for the taxability of the recipient, section 83 provides a corresponding deduction "under section 162" to the party for whom the services were performed, keyed to match the timing of the reporting of the income by the recipient. Sec. 83(h).

The Treasury regulations under section 83 were finalized subsequent to the trial and briefing in this case (T.D. 7554, filed July 21, 1978), although they were published in proposed form prior thereto. The heart of the issue in this case involves section 1.83-6(d), Income Tax Regs., upon which respondent relies in disallowing the losses claimed. This regulation provides as follows:

(d) *Special rules for transfers by shareholders—(1) Transfers.* If a shareholder of a corporation transfers property to an employee of such corporation

or to an independent contractor (or to a beneficiary thereof), in consideration of services performed for the corporation, the transaction shall be considered to be a contribution of such property to the capital of such corporation by the shareholder, and immediately thereafter a transfer of such property by the corporation to the employee or independent contractor under paragraphs (a) and (b) of this section. For purposes of this (1), such a transfer will be considered to be in consideration for services performed for the corporation if either the property transferred is substantially nonvested at the time of transfer or an amount is includible in the gross income of the employee or independent contractor at the time of transfer under § 1.83–1(a)(1) or § 1.83–2(a). In the case of such a transfer, any money or other property paid to the shareholder for such stock shall be considered to be paid to the corporation and transferred immediately thereafter by the corporation to the shareholder as a distribution to which section 302 applies.

This regulation is based upon the following language in the report of the Senate Finance Committee on the Tax Reform Act of 1969:

In general, where a parent company's or a shareholder's stock is used to compensate employees under a restricted stock plan, the transfer of the stock by the parent company or shareholder is to be treated as a capital contribution to the company which is to be entitled to a deduction in accordance with the restricted property rules. The parent company or the shareholder merely is to reflect the contribution as an increase of the equity in the company which is entitled to the compensation deduction. [Tax Reform Act of 1969, S. Rept. 91–522 (1969), 1969–3 C.B. 500, 502.]

Of course, it is well established that Treasury regulations, when not inconsistent with express statutory provisions, have the force of law. *Maryland Casualty Co. v. United States*, 251 U.S. 342 (1920). See sec. 7805. As such, they should not be overruled except for weighty reasons. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496 (1948), revg. 162 F.2d 866 (5th Cir. 1947), revg. 7 T.C. 669 (1946). Ordinarily, regulations must be sustained unless they are unreasonable and plainly inconsistent with the revenue statute. *Topps of Canada, Ltd. v. Commissioner*, 36 T.C. 326 (1961). Petitioner herein contends that the regulation in question is unreasonable and is not supported by the statute.

Section 83 is basically an income-defining section, enacted primarily to deal with the recognition of income under certain restricted stock compensation plans. The matter at issue here is a claimed deduction. But for subsection (h), section 83 really has nothing to do with deductions. Section 83(h) provides a deduction "under section 162" for the employer, to correspond in time with

the income required to be reported by the employee. This subsection does not address itself to the tax consequences to a stockholder who provides the shares used in the restricted stock plan. Thus, it would appear that section 1.83–6(d), Income Tax Regs., is clearly outside the scope of the statutory provisions of section 83.

Petitioner's claim for a loss deduction in this case is based upon section 1002, which provides for recognition of gain or loss upon the sale or exchange of property.[7] The facts are quite clear in this regard: petitioner sold shares of Watco stock to various employees for nominal consideration.[8] The fact that these sales were in connection with the rendering of services by the purchasers, while it may bring into play certain tax consequences to the employees and Watco under section 83, does not render the transaction any less a sale under section 1002, as far as petitioner is concerned. Thus, we believe that section 1.83–6(d), Income Tax Regs., is contrary to the express terms of the Code (i.e., sec. 1002) insofar as it would preclude the recognition of a loss on a sale of securities by characterizing the sale as a contribution to capital.

Moreover, the regulation in question flies in the face of numerous decisions of this and other courts holding that non-pro-rata surrenders of stock to the issuing corporation do not represent capital contributions but give rise to deductible losses. See, e.g., *Downer v. Commissioner, supra*; *Sack v. Commissioner*, 33 T.C. 805 (1960); *Estate of Foster v. Commissioner*, 9 T.C. 930 (1947); *Miller v. Commissioner*, 45 B.T.A. 292 (1941), acquiesced 1941–2 C.B. 9, acquiescence withdrawn and nonacquiescence substituted 1977–1 C.B. 2; *Budd International Corp. v. Commissioner*, 45 B.T.A. 737 (1941), acquiesced 1942–2 C.B. 3, acquiescence withdrawn and nonacquiescence substituted 1977–1 C.B. 2, revd. on other grounds 143 F.2d 784 (3rd Cir. 1944), cert. denied 323 U.S. 802 (1945); *Peabody Coal Co. v. United States*, 80 Ct. Cl. 202, 8 F. Supp. 845 (1934); *Burdick Executrix v. Commissioner*, 20 B.T.A. 742 (1930), nonacquiesced X–2 C.B. 82 (1931), affd. on other grounds 59 F.2d 395 (3rd Cir. 1932); *Wright v. Commission-*

---

[7]Since 1976, the provisions of sec. 1002 have been embodied in sec. 1001(c).

[8]Despite the restrictions on resale and the contingent right of petitioner to repurchase the stock sold, all of the sales in question appear to be closed transactions for tax purposes.

*er,* 18 B.T.A. 471 (1929). But see *Schleppy v. Commissioner,* 601 F.2d 196 (5th Cir. 1979), revg. *Smith v. Commissioner,* 66 T.C. 622 (1976), in which a surrender of stock not involving a transfer to a third party, was treated as a capital contribution.

In support of section 1.83–6(d), Income Tax Regs., respondent relies heavily upon the language of the Senate committee report quoted above. There can be no doubt that the regulation specifically follows the dictates of the committee report. However, the committee report is not the statute, and to the extent that its language goes beyond the legislation then being enacted or theretofore existing statutory provisions (i.e., sec. 1002), it certainly cannot serve as support for a regulation suffering the same infirmity. *Flex-O-Glass, Inc. v. United States,* an unreported case (N.D. Ill. 1959, 3 AFTR 2d 1034, 59–1 USTC par. 9328). This is particularly so in light of the long history of litigation, cited above, in which the Government had consistently failed to establish that non-pro-rata stock surrenders amounted to capital contributions, rather than recognizable losses. Certainly, if the Congress had intended to change the result of these cases, it could and should have done so by specific codification. Legislative history is strictly a tool of statutory interpretation (cf. *Gilbert v. Commissioner,* 241 F.2d 491 (9th Cir. 1957), revg. 25 T.C. 81 (1955)); it cannot be infused with an authority of its own.

Another argument which might be advanced in support of the regulation in question is that because section 83(h) allows a deduction which might not have been allowable under the prior case law (i.e., the deduction to the corporation, even though the compensation for services is effectively being paid by the stockholder), it is necessary to eliminate the stockholder's loss deduction previously allowed in the cases; otherwise section 83(h) would have, in effect, created a double deduction.[9] Although this argument at first blush has a persuasive ring, it does not withstand careful scrutiny. We do not view the loss resulting from the disposition of shares by a stockholder as the same economic loss or expenditure as that associated with the

---

[9]This argument can be stated another way as follows: If a stockholder pays the expense of his corporation, the corporation might claim the deduction on the theory that, in substance, the stockholder made a capital contribution and the corporation paid the expense. After the enactment of sec. 83(h) codifying the corporation's deduction, consistency of the theoretical construction requires that the paying stockholder be deemed to have made a capital contribution.

payment for services rendered. In other words, the deduction provided by section 83(h) merely recognizes that whenever income is required to be reported under section 83, there should be a matching *business expense* deduction under section 162; this has no inherent relationship with the realization of a gain or loss by a stockholder upon disposition of shares in return for services. Regardless of the fact that the disposition of shares is in a transaction which brings section 83 into play with respect to other parties, the relevant question for the stockholder is simply whether or not there has been a realization of a gain or loss in a transaction which warrants recognition of gain or loss for tax purposes.

Another reason that we are not persuaded by the "double deduction" argument is that it seems clear that such a "double deduction" *would* be appropriate in a case where stock is used in payment for services rendered directly to and for the benefit of the business of the stockholder, and not for the corporation. Thus, if services are paid for by the recipient thereof with securities which have increased or decreased in value, the transaction would result in a capital gain or loss to such recipient (relating to the economic gain or loss during the holding period of the securities), as well as a business expense deduction for the cost (measured by the value) of the services rendered. *United States v. General Shoe Corp.*, 282 F.2d 9 (6th Cir. 1960); *International Freighting Corp. v. Commissioner*, 135 F.2d 310 (2d Cir. 1943), affg. 45 B.T.A. 716 (1941). In the factual situation where the services are performed for the corporation, and not for the stockholder himself, as in *Downer* and its predecessors, prior to the enactment of section 83(h), the business expense deduction might have been lost because the expense was paid by another party. See *Zoby v. United States*, 364 F.2d 216 (4th Cir. 1966). Economically, the business expense was still incurred. Therefore, as we view it, the enactment of section 83(h), rather than allowing a double deduction, merely has the effect of allowing the business expense deduction which may have been previously disallowed solely for technical reasons. Again, the realization of a capital gain or loss to the stockholder should be viewed as a separate transaction.[10]

---

[10]To the extent that the allowance of a deduction by sec. 83(h) requires that the amount deducted be deemed to have been first contributed to capital by the stockholder who actually

Moreover, if one is to accept the double deduction argument, and to treat the stockholder as having made a capital contribution to the corporation, the result would be merely a *deferral* of the gain or loss with respect to the shares transferred, with their basis added to the basis of the shares retained. However, such a "unitary view" of a stockholder's investment in his corporation was analyzed and specifically rejected in *Downer* (48 T.C. at 91). Under the *Downer* "fragmented view" of stock ownership, the disposition of a portion of one's stockholdings would ordinarily call for a recognition of gain or loss with respect to that portion, rather than an adjustment to the basis of the remaining shares.[11] Again, the fact that section 83(h) now allows a business expense deduction to the corporation does not seem to produce any inherent inequity or loophole which would require the deferral of a gain or loss that would otherwise be recognized under the application of normal tax principles.

Finally, it should be noted that throughout the foregoing discussion, we have referred to "gain or loss" recognition upon the transfer of shares for services. Although the instant case and its predecessors involve the question of a loss deduction with respect to shares that have decreased in value, section 1.83–6(d), Income Tax Regs., if upheld, would apply equally to transfers of appreciated stock. This would result in a deferral of capital gain upon the transfer of appreciated stock for services rendered to the corporation, which deferral in our view would have no justification; in a capital gain situation the "double deduction" argument is, of course, obliterated.

In light of all of the foregoing, we hold that petitioner is entitled to capital loss deductions with respect to the sales of stock in question. *Downer v. Commissioner, supra.*

### Issue 2. Income From Farm Recapture Property

Section 1251, in general, provides that if farm recapture property is disposed of, the gain realized is treated as ordinary

---

paid the deductible amount, such stockholder's capital gain or loss would still be recognized on the theory that, in substance, his stock was sold for cash, which cash was in turn contributed to the corporation.

[11]"There is no persuasive reason why the shareholder's recognition of loss with respect to the surrendered stock should be suspended simply because he holds additional stock of the same corporation." See G. Bolding, "Non-Pro Rata Stock Surrenders, Capital Contribution, Capital Loss or Ordinary Loss?" 32 Tax Law. 275, 278 (1979).

income to the extent of the amount contained in the taxpayer's "excess deductions account" (EDA).

Subject to certain dollar limitations, in general, a taxpayer's EDA increases by the amount of his farm net loss each year (sec. 1251(b)(2)) and decreases by the amount of his farm net income (section 1251(b)(3)). Farm net loss is defined in section 1251(e)(2) as:

(2) FARM NET LOSS.—The term "farm net loss" means the amount by which—

(A) the deductions allowed or allowable by this chapter which are directly connected with the carrying on of the trade or business of farming, exceed

(B) the gross income derived from such trade or business.

Gains and losses on the disposition of farm recapture property referred to in section 1231(a) (determined without regard to this section or section 1245(a)) shall not be taken into account.

Total gross income shown on Bedford Farms' return was $128,434.33 in 1972 and $372,157.96 in 1973. From these amounts, respondent subtracted $20,169.14 in 1972 and $229,075.99 in 1973 in arriving at a revised gross income of $108,265.19 in 1972 and $143,081.97 in 1973. It is this reduction in gross income, leading to a corresponding increase in Bedford Farms' farm net loss and, in turn, a larger addition to the EDA in each of the years, that is in issue here.

In making his adjustment, respondent relies on the flush language in section 1251(e)(2) which provides that "Gains and losses on the disposition of farm recapture property referred to in section 1231(a) * * * shall not be taken into account." Bedford Farms reported capital gains of $20,169.14 in 1972 and $229,075.99 in 1973 from the sale of breeding cattle, and it is these gains which respondent has eliminated in computing "farm net loss" and the additions to the EDA. There is no dispute that this breeding cattle is livestock within the meaning of sections 1231(a) and 1231(b)(3) and, thus, farm recapture property. Under a literal reading of the statute, therefore, respondent is correct in his determination. Petitioner contends, however, that because the $20,169.14 in 1972 and $109,925.72 of the $229,075.99 in 1973 were not passed through by Bedford Farms as capital gains to petitioner on his personal returns, due

to certain statutory limitations applicable to subchapter S corporations,[12] such amounts do not constitute farm recapture property.

Petitioner maintains that because these amounts were not passed through as capital gains to the shareholders, they were effectively treated as ordinary income by Bedford Farms and thus did not constitute the proceeds from section 1231 property. Although petitioner's argument is ingenious, we must reject it. Section 1.1375–1(d), Income Tax Regs., provides, with exceptions not here relevant, that "for purposes of determining whether gain on the sale or exchange of an asset by an electing small business corporation is capital gain, the character of the asset is determined at the corporate level." Bedford Farms sold section 1231 property and, therefore, regardless of the character of the pass through of the gain to petitioner, it follows that such amounts are capital gains properly reported as such by Bedford Farms. Although petitioner may not have benefited from the capital gain treatment, this situation, in our view, does not warrant a result at variance with the literal language of section 1251(e)(2).

Petitioner next argues that respondent failed to properly reduce Bedford Farms' EDA by $56,860.89 in 1972. On his 1972 return, petitioner reported adjusted gross income of negative $7,674.92 (including a loss of $84,141.30 attributable to his share of Bedford Farms' loss ($84,259.27)) and itemized deductions of $46,185.97. After deducting an additional $3,000 for exemptions, petitioner showed taxable income of negative $56,860.89. Relying upon section 1251(b)(3)(A), petitioner maintains that $56,860.89 of the $84,141.30 loss should reduce Bedford Farms' EDA.

Section 1251(b)(3) provides:

(3) SUBTRACTIONS FROM ACCOUNT.—If there is any amount in the excess deductions account at the close of any taxable year (determined before any amount is subtracted under this paragraph for such year) there shall be subtracted from the account—

(A) an amount equal to the farm net income for such year, plus the amount (determined as provided in regulations prescribed by the Secretary or his delegate) necessary to adjust the account for deductions which did not

---

[12]The limitation is not disputed by respondent. Sec. 1375 and sec. 1.1375–1(a), Income Tax Regs., provide that capital gains of a subch. S corporation can be passed through to its shareholders only to the extent of current earnings and profits.

result in a reduction of the taxpayer's tax under this subtitle for the taxable year or any preceding taxable year, and

(B) after applying paragraph (2) or subparagraph (A) of this paragraph (as the case may be), an amount equal to the sum of the amounts treated, solely by reason of the application of subsection (c), as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

Petitioner argues that the amount of the negative taxable income in his 1972 return, $56,860.89, constitutes "the amount * * * necessary to adjust the [EDA] account for deductions which did not result in a reduction of the taxpayer's tax * * * for the taxable year or any preceding taxable year," within the meaning of subparagraph (A) quoted above.

The reduction provided in subparagraph 1251(b)(3)(A) is specifically to be determined as provided in regulations prescribed by the Secretary of the Treasury. The governing regulations are found in section 1.1251–2(c)(3), Income Tax Regs. These regulations provide complex mechanics for the computation of both a "temporary subtraction" from the EDA (sec. 1.1251–1(c)(3)(ii), Income Tax Regs.) and a "permanent subtraction" from the EDA (sec. 1.1251–2(c)(3)(iii), Income Tax Regs.). The temporary subtraction is applicable for any given taxable year only in the determination of farm property recapture income for that year, if any; it does not affect the EDA which gets carried forward to succeeding taxable years. Thus, the "temporary subtraction" rules are not applicable with respect to petitioner's 1972 EDA balance (which is carried forward into 1973 for purposes of determining ordinary income from Bedford Farms' sale of farm recapture property in that year).

With regard to the permanent subtraction from the EDA for deductions not giving rise to tax benefits, subdivision (iii) of section 1.1251–2(c)(3), Income Tax Regs., limits this as follows:

(iii) *Permanent subtraction.* The amount permanently subtracted from the excess deductions account for a taxable year is the excess of the farm portion of any net operating loss which may be carried to the preceding year (reducing by the portion of such loss which reduced taxable income (computed without regard to the deduction under section 172(a)) for such preceding year) over the amount of such loss which may be carried to the taxable year, but the subtraction shall not be made earlier than the taxable year in which the excess deductions account is increased by reason of such loss.

Thus, the permanent adjustment to petitioner's EDA for 1972 would be applicable only with respect to certain prior years' net

operating losses. The foregoing regulation does not contemplate a reduction in the EDA with respect to negative taxable income (or even operating losses) of the current tax year, and thus, section 1251(b)(3)(A) cannot be interpreted to permit the reduction urged by petitioner.[13]

However, from our review of petitioner's income tax returns included in the record, it appears that the permanent EDA reduction provided in section 1.1251–2(c)(3)(iii), Income Tax Regs., might be applicable in 1972 or 1973 with respect to net operating loss carryovers from prior years. Thus, a net operating loss carryover from a year prior to 1971 might result in the carryover to 1971 exceeding the carryover to 1972 or the carryover to 1972 exceeding the carryover to 1973. In either event, the amount of such excess would require a permanent adjustment in the taxpayer's EDA, which in turn would affect the amount of farm recapture income in 1973. The amount of such adjustment, if any, may be determined in the computation under Rule 155.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

Scott, *J.*, dissenting: I respectfully dissent from the holding of the majority on the capital loss issue in this case. I agree that our cases cited by the majority for the proposition that "non-pro-rata surrenders of stock to the issuing corporation do not represent capital contributions, but give rise to deductible losses" so hold. However, I do not agree that any other court has so held. The Court of Appeals for the Fifth Circuit in *Schleppy v. Commissioner*, 601 F.2d 196 (5th Cir. 1979), in reversing *Smith v. Commissioner*, 66 T.C. 622 (1976), held to the contrary. After referring to the holdings of this Court allowing a loss for the non-pro-rata surrender of stock by a stockholder to the issuing

---

[13]Unlike the regulation held invalid in our opinion on the first issue in this case, sec. 1.1251–1(c)(3), Income Tax Regs., has not been challenged by petitioner, and it appears to be a reasonable and well thought out (although well nigh unreadable) attempt to apply the policy contemplated in the statute. Moreover, this regulation was promulgated under specific statutory mandate and, thus, must be accorded nearly statutory weight. See *Rudd Mfg. Co. v. Commissioner*, 10 T.C. 14 (1948), affd. 173 F.2d 222 (3d Cir. 1949).

corporation, the Circuit Court stated: "We find no Court of Appeals decision that determines the correctness of these decisions. We therefore write on a clean sheet."

In my view, we have been incorrect in our holding that an individual who transfers stock either to the corporation or to a third party for the benefit of the corporation sustains a loss. The Supreme Court and numerous lower courts, including this Court, have uniformly held that a payment by a stockholder for the benefit of his corporation constitutes a contribution to capital and not an expense of carrying on the business of the individual. *Interstate Transit Lines v. Commissioner*, 319 U.S. 590 (1943).

If the transfer for the benefit of the corporation made by a stockholder was of some property other than cash or stock of the corporation for whose benefit the transfer was made, we would undoubtedly hold that such transfer was a contribution to the capital of the corporation. I can see no reason why a different result should be reached because the property used by a stockholder for the benefit of the corporation is the stock of the corporation for whose benefit the transfer was made. I therefore agree with the conclusion of the Circuit Court in *Schleppy v. Commissioner, supra*, although I respectfully disagree with the interpretation placed by that court on our opinion in *Foster v. Commissioner*, 9 T.C. 930 (1947).

Since, clearly, the transfer of the stock by petitioner in this case was for the benefit of the corporation, I would hold for respondent. Even though I consider our holdings in the cases relied on by the majority to be incorrect, I would be hesitant to depart from holdings extending over a period of 50 years, except for the fact that respondent's regulation, which the majority has declared invalid, fairly puts taxpayers on notice that transfers of stock for the benefit of the issuing corporation might now be considered contributions to capital.

I would accept respondent's regulation, not because of any specific statement in section 83 of the Code which supports it, but because it is now and has been, despite our decisions to the contrary, a proper interpretation of the result of a transaction such as is here involved.

I have no problem with the situation of a stockholder transferring stock to a third party for the benefit of the issuing corporation where the transfer is for a sum that results in a gain to the transferor. To the extent the transferring stockholder

receives consideration other than a benefit to the corporation from his transfer of stock, he has received a gain in the amount of the difference in the monetary consideration received and his basis in the stock transferred. This is true even though the transfer may be at less than the fair market value of the stock. This situation can be equated with a bargain sale of stock to a relative. We have held that a taxpayer in such a situation has made a gift of the value of the stock in excess of the bargain price at which it is transferred even though that bargain price was greater than his basis in the stock. In such a situation, we have held that there is both a taxable gain and a gift. If stock is transferred at less than its value but more than its basis for the benefit of the issuing corporation, instead of a gift, a taxpayer would have made a contribution to the capital of the corporation of the excess of the value of the stock over the price received for it. He would have a taxable gain and also would have made a contribution to the capital of the corporation. This is not to be interpreted as determining whether a contribution to capital under these circumstances would increase the taxpayer's basis in his remaining stock. This is a separate issue that is not involved in the instant case.

DAWSON and CHABOT, *JJ.*, agree with this dissenting opinion.

SIMPSON, *J.*, dissenting: Usually, when we have a vexing question of statutory interpretation, we are faced with a problem not anticipated during the development of the legislation, and we are unable to ascertain the treatment which Congress would have intended if it had considered the matter. Not so in this case. Here, the legislative purpose is indisputable, and the regulations undertake to carry out that purpose. The majority quibbles with the way Congress undertook to express its purpose, and because it did not set forth all the intended rules in the statute itself, the majority proposes to disregard the clearly manifested legislative purpose.

When Congress decided to legislate with respect to the tax treatment of bargain sales of property to persons rendering services, it recognized that in addition to sales by an employer to an employee, it needed to provide rules broad enough to cover other compensatory sales of property. Thus, section 83(a), which

governs the taxability of the recipient of the property, applies "If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed." Thus, the rule applies to any compensatory transfer, not merely to a transfer to an employee. It includes a sale made by a parent or shareholder of the employer corporation to an employee of such corporation. For example, in the case of a group of affiliated corporations, the parent corporation may wish to retain all of the stock of the subsidiaries so that the employees of the subsidiaries are offered an opportunity to purchase, at a bargain, the stock of the parent.

Though the primary purpose of section 83 was to provide rules for determining when the recipient of the bargain realized compensation and was taxable thereon, Congress recognized that questions would arise as to whether and when a deduction for compensation is to be allowed. See *Deputy v. du Pont*, 308 U.S. 488 (1940); *Hewett v. Commissioner*, 47 T.C. 483 (1967); *Rand v. Commissioner*, 35 T.C. 956 (1961). As a result, it enacted section 83(h), which accomplishes two objectives: it allows a deduction under section 162 to the person for whom the services are performed, and it allows such a deduction when the compensation is includable in income. By describing the recipient of the deduction as "the person for whom were performed the services," it is clear that Congress had in mind situations where the transferor would be a person other than the employer; there would have been no need to use such convoluted language if Congress had meant merely to cover a bargain sale by an employer to an employee. The committee report reinforces that view. S. Rept. 91–552 (1969), 1969–3 C.B. 423, 500–502.

In deciding whether a deduction is to be allowable in such situation, and to whom, the draftsmen no doubt had in mind the various views of the transaction that could be taken: when a shareholder sells his stock to an employee of the corporation, it could be viewed as a simple sale (*Downer v. Commissioner*, 48 T.C. 86 (1967)); under that view, there would be a capital transaction giving rise to gain or loss, but there would be no transfer of compensation taxable to the employee and deductible by either the transferor or the employer. *Deputy v. du Pont*, *supra*. In the alternative, the transaction could be viewed as a transfer of stock to the corporation and a transfer of such stock by the corporation to the employee. Since the statute allows a

deduction for compensation, the statute makes clear that Congress rejected the view that the transaction was merely a sale by a shareholder to an employee.

Having decided to tax the employee on the receipt of compensation and to allow the corporation a deduction for the payment thereof, the draftsmen went on to explain in the committee report the theory on which such treatment was based; that is, the parent or shareholder is considered to have made a contribution to the capital of the corporation. The draftsmen could have expanded the provisions of section 83(h) and included in the statute rules reflecting the treatment of the transaction described in the committee report.[1] Surely, we cannot have any doubt that Congress would have passed the legislation had the statutory provisions been expanded in that manner, and surely, we can have no doubt that the statements of the committee report accurately reflect the legislative purpose. See, for example, *United States v. Davis*, 397 U.S. 301, 308–312 (1970), in which the Supreme Court relied on legislative history to decide the scope of the "not essentially equivalent to a dividend" provision of section 302(b)(1), and *Walt Disney Productions v. United States*, 480 F.2d 66, 68–69 (9th Cir. 1973), cert. denied 415 U.S. 934 (1974), in which the court relied on legislative history to decide what was "tangible personal property" for purposes of the investment credit.

In *Downer v. Commissioner, supra,* we adopted a different view of the transaction, but since the decision in that case, Congress has reviewed the subject and adopted section 83(h) reflecting its view of the transaction. In taxing the employee on the compensation and in allowing the corporation a deduction for compensation, Congress rejected the view that there was simply a sale by the shareholder to the employee. Under such circumstances, we are no longer bound by our decision in

---

[1]Sec. 83 was enacted as a part of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 588. Although such legislation was a major tax bill, it was considered and enacted by the Congress in a single calendar year—hearings on tax reform were announced by the Ways and Means Committee on Jan. 29, 1969, and the legislation was finally approved by the Congress on Dec. 22, 1969. In hindsight, it is easy for us to say that the draftsmen should have expanded the statutory provisions, but their failure to do so may be understandable in the light of the time pressures upon them.

*Downer,* and we should accept and apply the clearly expressed legislative purpose.[2]

FAY, WILBUR, and CHABOT, *JJ.,* agree with this dissenting opinion.

---

[2]I would sustain the regulations disallowing a loss deduction in this case, for it is clear to me that such provision of the regulations is consistent with sec. 83(h) and its legislative history. However, I am not expressing approval of all the provisions of the regulations, and in fact, there is a serious question as to whether some of those provisions are consistent with the committee report and the concept that the shareholder is considered to have contributed the stock to the corporation. See, e.g., secs. 1.83–1(a)(1)(ii), 1.83–6(b), (c), and (d)(2), Income Tax Regs.